Oral Argument Not Yet Scheduled

**IN THE
UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| DELAWARE RIVERKEEPER NETWORK; MAYA VAN ROSSUM, the Delaware Riverkeeper, | ) ) ) | Docket No. 16-1092 |
| | ) | |
| *Petitioners*, | ) ) | **BRIEF OF PETITIONERS IN SUPPORT OF PETITION FOR REVIEW** |
| v. | ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| *Respondent*, | ) ) | |
| and, | ) ) | |
| TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC, | ) ) ) | |
| *Intervenor*. | ) ) | |

_____ )


Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
215-369-1188 (tel)
215-369-1181 (fax)

*Counsel for Petitioners*

## RULE 26.1 DISCLOSURE STATEMENT

The Delaware Riverkeeper Network is a nonprofit 501(c)(3) membership organization that advocates for the Protection of the Delaware River, its tributaries, and the communities of its watershed. The Delaware Riverkeeper Network does not have any parent corporation, nor does it issue stock.

Respectfully submitted this 3rd day of June 2016,

By: */s/ Aaron Stemplewicz*

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, Pennsylvania 19007
Phone: 215.369.1188
Fax: 215.369.1181
aaron@delawareriverkeeper.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

GLOSSARY ................................................................................ viii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES........................................................2

STATUTES AND REGULATIONS ...................................................6

STATEMENT OF THE CASE ...........................................................6

STANDING ...................................................................................13

STANDARD OF REVIEW ..............................................................15

SUMMARY OF THE ARGUMENT .................................................19

ARGUMENT ................................................................................19

I.      The Commission Violated 33 USC §1341 because it
        Granted Intervenor's Request to Construct and Operate its
        Proposed Pipeline Project Prior to the Issuance of a Section
        401 Water Quality Certification ...............................................20

II.     The Commission's Mischaracterization Of Project Impacts
        Fails To Provide An Adequate Baseline From Which A
        NEPA Review Can Proceed ....................................................35

        a. The Commission Improperly Classified Numerous
           Wetlands Impacted By The Proposed Project....................37

        b. The Commission Miscalculated the Impact to Wetland
           Cover Type from the Proposed Project ............................44

III.    The Commission Violated NEPA by Failing to Disclose or
        Verify Flow Velocity and Other Technical Data Necessary
        to Determine the Full Extent of the Project's Inter-
        relatedness to Previous, Pending, and Future Projects, and
        also to Determine the Operational Safety of the Project ..........50

i

IV.    The Commission Violated NEPA by Unlawfully Treating
       Similarly Situated Parties Differently ......................................................57

CONCLUSION ......................................................................................................60

# TABLE OF AUTHORITIES

**FERC Orders**

149 FERC ¶ 61,258 (2014) .......................................................................5

149 FERC ¶ 61,199 (2014) .....................................................................32

154 FERC ¶ 61,166 (2016) .......................................................................5

**Cases**

*Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197 (1st Cir. 1999)................. 16-17

*Alabama Rivers Alliance v. Federal Energy Regulatory Commission*, 325 F.3d 290 (D.C. Cir. 2003) ............................................................................. 21-22

*American Rivers, Inc. v. FERC*, 201 F.3d 1186 (9th Cir. 1999) ...........................36

*Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1112 (D.C. Cir. 2001) ......... 18-19

*\*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983).......27

*Baltimore Gas and Electric Company v. Natural Resources Defense Council, Inc.,* 462 U.S. at 87 (1983) ...................................................................36

*Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1998) ..........................36

*\*Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810 (9th Cir. 2001)............................................................................................27

*Cal. Trout, Inc. v. FERC*, 313 F.3d 1131 (9th Cir. 2002)........................................18

*Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ............ 18,24

*City of Olmsted Falls v. FAA*, 292 F.3d 261 (D.C. Cir. 2002) ...............................18

*City of Tacoma*, 460 F.3d 53 (D.C. Cir. 2006) .................................................. 21,29

*Cotton Petroleum Corp.' v. Dep't of Interior*, 870 F.2d 1515 (10th Cir. 1989) .....17

*Delaware Riverkeeper Network, et al. v. Federal Energy Regulatory Commission*,
  753 F.3d 1304 (D.C. Cir. 2014) ................................................................ 15,50,54

*Department of Transportation v. Pub. Citizen*, 541 U.S. 752 (2004) .............. 51,52

*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996)................14

*Friends of the Earth, Inc. v. Hall*, 693 F. Supp. 904 (W.D. Wash. 1988)..............53

*Friends of the Earth, Inc. v. Laidlaw Environmental Services
  (TOC), Inc.*, 528 U.S. 167 (2000)................................................................ 13,14

*Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571 (D.C. Cir. 1999) ......................16

*Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir. 1980) ...................51

*Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*,
  857 F.2d 505 (9th Cir. 1988) ..................................................................... 18,36

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ...................................................................................14

*Inland Empire Pub. Lands v. United States Forest Serv.*, 88 F.3d 754 (9th Cir.
  1996)......................................................................................................... 51-52

*Keating vs. Federal Energy Regulatory Commission*,  927 F.2d 616 (D.C. Cir.
  1991)..........................................................................................................22

*LaFlamme v. FERC*, 852 F.2d 389 (9th Cir.1988) ...................................................37

*Lands Council v. Mcnair*, 537 F.3d 981 (9th Cir. 2008) .........................................37

*Lands Council v. Powell,* 395 F.3d 1019 (9th Cir. 2005)........................................52

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................ 13,15

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) .....................16

*Melody Music, Inc. v. FCC*, 345 F.2d 730, 733 (D.C. Cir. 1965) ...........................58

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983). ...................................................................... 16,52

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ...........................................................14

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
    565 F.3d 683 (10th Cir. 2009)..............................................................52

*Natural Resources Def. Council v. Southwest Marine, Inc.*,
    236 F.3d 985 (9th Cir. 2000)................................................................13

*\*New Orleans Channel 20, Inc. v. FCC*, 830 F.2d 361 (D.C. Cir. 1987) ..............58

*Northern Plains Research Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ................................................... 17-18,36

*Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ...............................................................16

*Oregon Natural Desert Association v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th
    Cir. 2010)...........................................................................................51

*Pacific Coast Federation of Fisherman's Associations v. U.S. Dept. of the Interior*,
    929 F.Supp.2d 1039 (E.D. Ca. 2013) ..................................................53

*\*Public Media Center v. FCC*, 587 F.2d 1322 (D.C. Cir. 1978)...........................58

*\*PUD No. 1 of Jefferson County v. Washington Dept. of Ecology*,
    511 U.S. 700 (1994) ...........................................................................21

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1998) .. 37,50,51

*S.D. Warren Co. v. Maine Bd. of Envtl. Protection*, 547 U.S. 370 (2006).............31

*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973)........................................................52

*Specter v. Garrett*, 971 F.2d 936 (3rd Cir. 1992) ..................................................16

*State of North Carolina v. Federal Energy Regulatory Commission*, 112 F.3d 1175 (D.C. Cir. 1997) ................................................................................22

*Thompson v. Calderon*, 151 F.3d 918 (9th Cir. 1998) ...............................................24

*\*United States v. Deaton*, 209 F.3d 331, 336 (4th Cir. 2000) ................................27

*U.S. v. Marathon Development Corporation*, 867 F.2d 96 (1st Cir. 1989) ............22

*Warth v. Seldin*, 422 U.S. 490, 515 (1975) .............................................................15

**Federal Statutes**

15 U.S.C. § 717f(c)(1)(A) ..........................................................................................1

15 U.S.C. § 717r(a) ....................................................................................................1

15 U.S.C. § 717r(b) ....................................................................................................1

15 U.S.C. § 717f(e) ...................................................................................................25

33 U.S.C. § 1341(a)(1) .................................................................................5,20-21,24-25

33 U.S.C. § 1251(d) ..................................................................................................18

**Federal Regulations**

40 C.F.R. § 1502.22 ..................................................................................................52

40 C.F.R. § 1508.27(b)(3) ................................................................................... 36,40

**Pennsylvania Code**

25 Pa. Code § 93.4a .......................................................................................... 28,39

25 Pa. Code § 96.3(b) ...............................................................................................39

25 Pa. Code § 105.1 ..................................................................................................28

25 Pa. Code § 105.15 ................................................................................................28

25 Pa. Code § 105.17 ....................................................................................28

25 Pa. Code §§ 105.17(1)(2)........................................................................39

25 Pa. Code § 105.18a(a)(1) .......................................................................28

25 Pa. Code § 105.20a .................................................................................28

25 Pa. Code § 105.451 .................................................................................28

**Secondary Sources**

H.R. Conf. Rep. No. 940, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin. News 2712, 2741 ......................................................... 22-23

Council on Environmental Quality, Considering Cumulative Effects under the National Environmental Policy Act, at 41 (January 1997) ............................ 36-37

# GLOSSARY

| | |
|---|---|
| CWA | Clean Water Act |
| Commission | Federal Energy Regulatory Commission |
| Intervenor | Transcontinental Pipe Line Company, LLC |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| Petitioners | Delaware Riverkeeper Network, and the Delaware Riverkeeper |
| Project | Leidy Southeast Expansion Project |
| R. | Administrative Record as per Amended Certified Index |
| P[P] | Paragraph[s] |

## JURISDICTIONAL STATEMENT

The Natural Gas Act ("NGA") requires a Certificate of Public Necessity and Convenience ("certificate") from the Federal Energy Regulatory Commission ("Commission") for constructing facilities for the transportation of gas. *See* 15 U.S.C. § 717f(c)(1)(A). Any person aggrieved by a Commission order granting a certificate may seek rehearing within thirty days of the order's issuance. *See* 15 U.S.C. § 717r(a). The NGA gives this Court jurisdiction to review Commission orders approving certificates, but limits review to objections "urged before [the Commission] in [an] application for rehearing," and denied in an order on the rehearing request. 15 U.S.C. § 717r(b). Review must be sought within sixty days of denial. *Id*.

Delaware Riverkeeper Network, and the Delaware Riverkeeper, (collectively "Petitioners") urged the issues raised here in a January 16, 2015 rehearing request, R. 411, JA ___-___, submitted within thirty days of the December 18, 2014 Order granting a certificate of public convenience and necessity ("Order") for Transcontinental Gas Pipe Line Company's ("Intervenor") Leidy Southeast Expansion Project ("Project"). R. 406, JA ___. The Commission issued an order denying Petitioners' rehearing request ("Order Denying Rehearing") on March 3,

2016.[1] R. 569, JA ___. Petitioners filed a petition for review on March 8, 2016, five days after the Commission's final decision. Because Petitioners timely submitted the issues raised here to the Commission, were denied rehearing, and timely petitioned for review, this Court has jurisdiction.

## STATEMENT OF THE ISSUES

1) Did the Commission violate the Clean Water Act ("CWA") by issuing a Certificate of Convenience and Public Necessity for Transcontinental Gas Pipe Line Company's Leidy Southeast Expansion Project prior to the Pennsylvania Department of Environmental Protection issuing a Section 401 water quality certification for the Project? (Raised at R. 445, R. 411 at 50-52, JA ___, JA ___-___; ruled on at R. 569 at PP41-47, JA ___-___)

2) Did the Commission violate the National Environmental Policy Act ("NEPA") by failing to establish an accurate baseline from which to conduct its review by mischaracterizing and misclassifying wetlands impacts? (Raised at R. 381 at 1-11, R. 411 at 34-46; JA ___-___, JA ___-___; ruled on at R. 569 at PP36-38, JA ____-____)

---

[1] The Commission's Order Denying Rehearing was issued exactly one day after the Petitioners filed a complaint in the United States District Court of the District of Columbia, Docket No. 16-416, alleging, among other things, that the Commission's failure to take final agency action on Petitioners' rehearing request unlawfully prevents timely judicial review of natural gas pipeline projects. The Complaint specifically identified the docket for this project, CP13-551, as an example of the Commission's bias and failure to act.

3)    Did the Commission violate the NEPA by failing to disclose or verify flow velocity and other technical data necessary to determine the full extent of the Project's inter-relatedness to previous, pending, and future projects, and also to determine the operational safety of the Project? (Raised at R. 381 at 26-29, R. 411 at 46-48, JA ___-___, JA ___-___; ruled on at R. 569 at PP28-35, JA ___-___)

4)    Did the Commission violate the NEPA by unlawfully treating similarly situated parties differently? (Raised at R. 381 at 20-21, R. 411 at 31-32, JA ___-___, JA ___-___; ruled on at R. 569 at PP28-35, JA ___-___)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and Amici

As per Circuit Rule 28(a)(1)(A), the undersigned, on behalf of Delaware Riverkeeper Network, and Maya van Rossum, hereby state that as of the date of filing the Docketing Statement, the following entities are parties, intervenors, or amici in this Court in this and all related cases:

*Petitioners*: Delaware Riverkeeper Network; the Delaware Riverkeeper, Maya van Rossum.

*Respondent*: Federal Energy Regulatory Commission.

*Intervenor*: Transcontinental Gas Pipe Line Company L.L.C.

*Applicant*: Transcontinental Gas Pipe Line Company L.L.C.

3

Parties that have appeared before the Federal Energy Regulatory Commission in respect to the Orders at issue herein are:

*Applicant*: Transcontinental Gas Pipe Line Company L.L.C.

*Intervenors*: Agharkar, Shreeram N; Aghevli, Karleen; Altmann, Jeanne; Anadarko Energy Services Company; Atmos Energy Marketing, LLC; Barr, Christopher and Patricia Shanley Beardsley-Humphreys, Jennifer M.; Beatty, Richard; W. Blumenthal, Barbara; Cabot Oil & Gas Corporation; Calpine Energy Services, LP; Cherry, Kathleen P.; Chevron Natural Gas; Chow, Paula K.; Consolidated Edison Company of New York and Philadelphia Gas Works (jointly); Delaware Riverkeeper Network; Duke Energy Carolinas, LLC; Duke Energy Florida, Inc.; and Duke Energy Progress, Inc.; Exelon Corporation; ExxonMobil Gas & Power Marketing Company; Florida Power & Light Company; Fridman, Symon and Helen; Goldfarb, Sidney J.; Goldston, Robert J.; Grossman, Gene and Jean B.; Hoppenot, Anne and Herve; Josephson, Paul; Joshi, Rakesh; Law, Jr., Stuart A., and Karen S.; Madden, Jeanne-Anne; Municipal Gas Authority of Georgia and Transco Municipal Group; Municipality of Princeton; National Fuel Gas Distribution Corporation; National Grid Gas Delivery Companies; Neufeld, Leah; New Jersey Department of Environmental Protection; New Jersey Natural Gas Company; NJR Energy Services Company; Noble Energy Inc.; North Carolina Utilities Commission; Pang, Myungyun; Peifer, Cynthia H.; Piedmont

4

Natural Gas Company, Inc.; Pollard, Carol S.; Preston, Marvin IV and Candace L.; Princeton Ridge Coalition; Public Service Company of North Carolina and South Carolina Electric & Gas Company; Sierra Club, New Jersey Chapter, Environment New Jersey, and Food & Water Watch; Shapiro, Paul and Helene; Shell Offshore, Inc.; Sourland Conservancy; Stonybrook-Millstone Watershed Association; Southern Company Services, Inc.; Township of Montgomery; Township of Readington; UGI Distribution Companies; Vilko, Naomi; Waldorf School of Princeton; Washington Gas Light Company; Winant, John and Kathy; Yuan, Kaixu; Zhang, Tianyi.

## Rulings Under Review

As per Circuit Rule 28(a)(1)(B), the rulings under review are Federal Energy Regulatory Commission Order 149 FERC ¶ 61,258 (2014) (December 18, 2014 order approving issuance of Certificate of Public Convenience and Necessity), 154 FERC ¶ 61,166 (2016) (March 3, 2016 order denying Petitioners' rehearing request), and any subsequent letter orders authorized thereby.

### Related Cases

As per Circuit Rule 28(a)(1)(C), the following are related cases to the present matter:

*Delaware Riverkeeper Network, et al. v. Pennsylvania Department of Environmental Protection, et al.*, Third Circuit Court of Appeals, Docket No. 15-2122

*Delaware Riverkeeper Network, et al. v. Federal Energy Regulatory Commission*, D.C. Circuit Court of Appeals, Docket No. 15-1052

*New Jersey Conservation Foundation, et al v. New Jersey Department of Environmental Protection, et al.*, Third Circuit Court of Appeals, Docket No. 15-2158

*Delaware Riverkeeper Network, et al. v. Commonwealth of Pennsylvania, et al.*, Pennsylvania Environmental Hearing Board, Docket No. 2015-060-M

*Delaware Riverkeeper Network, et al. v. Federal Energy Regulatory Commission et al.*, United States District Court for the District of Columbia, Docket No. 16-416.

## STATUTES AND REGULATIONS

The Addendum presents pertinent statutory and regulatory provisions.

## STATEMENT OF THE CASE

Intervenor filed its application with the Commission on September 30, 2013, to construct and operate the Project. R. 183, JA ___-___. The Project is one of a series of related natural gas pipeline projects to upgrade Intervenor's existing Leidy line pipeline system. In Pennsylvania, the Project involves the installation of approximately 5.29 miles of 42 inch pipe in Luzerne County, Pennsylvania (the "Dorrance Loop"), and approximately 11.47 miles of 42 inch pipe in Luzerne and Monroe Counties, Pennsylvania (the "Franklin Loop").[2] *See* R. 183 at 5, JA ___.

The Commission issued an Environmental Assessment for the Project on August 11, 2014, recommending a Finding of No Significant Impact. R. 359 at 13,

---

[2] Pipeline loops are new pipes placed adjacent to an existing pipeline and connected to it at both ends.

6

JA ___. Petitioners submitted comments on the Environmental Assessment on September 10, 2014, asserting that the Commission failed to properly analyze and consider a host of issues. R. 381, JA ___-___.

In the Environmental Assessment the Commission identified the need for Intervenor to obtain a water quality certification from the Pennsylvania Department of Environmental Protection, as required by Section 401 of the Clean Water Act. R. 359 at 28, JA ___. Section 1341(a)(1) of the Clean Water Act states, in part, "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence." *See* 33 U.S.C. § 1341(a)(1). On June 10, 2014 Intervenor submitted its application to the Pennsylvania Department of Environmental Protection ("Department") for the issuance of the Section 401 water quality certification. R. 484 at 1, JA ___.

On December 18, 2014, the Commission issued an order including a Finding of No Significant Impact and certificate approval for the Project. R. 406 at PP44, JA ___. On January 16, 2015, Petitioners timely submitted a rehearing request. R. 411, JA ___-___.

On February 12, 2015, Petitioners filed a Motion for Stay with the Federal Energy Regulatory Commission requesting a stay of any construction activity and any other land disturbance conducted under the Certificate. R. 425, JA ___-___.

Petitioners specifically identified that, "the Clean Water Act clearly prohibits FERC from issuing the Order in advance of the grant of the required Section 401 Certification." R. 425, JA ___-___. The motion was not addressed by the Commission until March 12, 2015, when the motion was denied. R. 468, JA ___-___.

The Commission granted Petitioners' request for rehearing of the Commission's order approving the Project on February 18, 2015; however, it was only granted for the sole purpose of securing additional time to consider Petitioners' comments. R. 428, JA ___.

Prior to the Commission taking final action on Petitioners' rehearing request and Petitioners' Motion for Stay, and while the Section 401 water quality certification was still under review by the Department, the Commission began providing authorizations for various forms of construction activity to proceed on the Project. For example, on January 30, 2015, the Commission issued a letter order granting Intervenor's first request to begin construction activity, stating that it:

> grant[s] [Transco's] January 15, 2015 request for Transcontinental Gas Pipe Line Company, LLC's ("Transco") to begin construction of the meter and regulation stations and valves in Maryland and Virginia, as approved in the above-referenced docket for the Leidy Southeast Expansion Project. I also grant your request to begin construction at Compressor Station 517 in Columbia County, Pennsylvania.

R. 420, JA ___ (emphasis added). The Commission then issued an additional three letter orders providing Intervenor authorization to begin different aspects of construction activity. On February 5, 2015, the Commission authorized Intervenor "to begin construction at the Mt. Effort pipe yard, as approved in the above-referenced docket for the Leidy Southeast Expansion Project." R. 422, JA ___.

Petitioners submitted a comment on February 26, 2015, to the Commission noting that the authorization of tree felling:

> will fundamentally undermine the authority of the Section 401 Water Quality Certification by cutting the very trees that the Section 401 permit is designed to protect. This is but one example of the myriad of ways in which the remaining outstanding federal authorizations may materially alter the project such that the premature tree felling activities requested by Transco will result in unnecessary, and unlawfully, harm to the environment.

R. 445, JA ___-___. Petitioners' February 26, 2015 comment letter was ignored by the Commission, and tree felling construction activity was allowed to proceed as authorized in a Commission letter order dated March 9, 2015. This letter order granted Intervenor the right to:

> begin non-mechanized tree felling activities in the following areas: the Dorrance and Franklin Loops in Monroe and Luzerne Counties, Pennsylvania; Compressor Stations 515 and 520 in Luzerne and Lycoming Counties, Pennsylvania; and certain upland segments of the Skillman and Pleasant Run Loops in Mercer, Somerset, and Hunterdon Counties, New Jersey, as specified in Attachment A to Transco's February 23, 2015 request.

R. 466, JA ___.

9

Petitioners filed a Petition of Writ Under the All Writs Act in the United States Court of Appeals for the District of Columbia on March 10, 2015, because while Petitioners were waiting for the Commission to respond to its requests for a rehearing, and before Petitioners could file a petition with the Court for review of the order, the Commission was allowing construction activities to proceed harming Petitioners' recreational and aesthetic interests by irreversibly destroying the natural beauty and environmental quality of over 140 acres of forested areas adjacent to some of Pennsylvania most valuable streams and wetland resources. *See* Petition for Writ, *In Re The Delaware Riverkeeper Network*, D.C. Cir., Docket No. 15-1052. The Court denied Petitioners' petition in a single sentence *per curium* order on March 19, 2015, stating only that "Petitioner has not satisfied the stringent requirements for a stay under the All Writs Act. *See, e.g., Reynolds Metals Co. v. FERC*, 777 F.2d 760, 762 (D.C. Cir. 1985)."

On March 25, 2015 the Commission granted Intervenor an additional request to:

> begin construction at Compressor Station 205 in New Jersey and Compressor Stations 515 and 520 in Pennsylvania. I also grant your request to begin non-mechanized tree felling of 7.63 acres of extra workspace along the Franklin Loop in Luzerne County, Pennsylvania. Lastly, I approve your variance request for use of the 20-acre Dunmore Yard in Lackawanna County, Pennsylvania for use during construction of the Dorrance Loop.

R. 474, JA ___.

10

The Department did not issue the Section 401 water quality certification until April 8, 2015, R. 484 at 1, JA ___. On May 5, 2015 Petitioners petitioned the Court of Appeals for the Third Circuit for review of the Department's Section 401 water quality certification as being arbitrary, capricious, or otherwise not in accordance with law. *See Delaware Riverkeeper Network v. Sec'y of Pennsylvania Dep't of Envtl. Prot.*, No. 15-2122 (3d. Cir. filed May 5, 2015). Petitioners contended that the Department violated Pennsylvania's water quality standards and the Clean Water Act by unlawfully issuing a Section 401 water quality certificate to Intervenor for the Project. Briefing was completed in September 2015, and oral argument was conducted in October 2015. A decision is still pending before the Third Circuit Court of Appeals.

After sitting on Petitioners' rehearing request for roughly a year and two months – and thereby effectively blocking Petitioners' only viable access to judicial review as provided in the Natural Gas Act of the proposed Project – the Commission finally denied Petitioners' rehearing request on March 3, 2016. R. 569, JA ___-___.

A significant amount of environmentally sensitive areas and valuable ecological resources have been, and will be in the future, degraded by the proposed Project. In Pennsylvania, the Project cut through publically accessible conservation areas and impacted at least sixteen acres of wetlands, many of which meet the

11

classification criteria in Pennsylvania as "exceptional" value wetlands, including one of the largest and least disturbed boreal conifer wetlands in Pennsylvania. R. 411 at 2-11, JA ___-___. The Project also cut through numerous streams, tributaries, and rivers, including the Lehigh River. R. 406 at 18, JA ___. Additionally, over 375 acres of wooded mountains and pastoral landscapes were disturbed as a result of construction activity for the Project's right-of-way and access roads. R. 406 at 70, JA ____. While much of the construction activity is complete, granting Petitioners' the relief sought will allow proper environmental review to inform appropriate remediation, re-vegetation, soil stabilization, and other mitigation efforts that remain ongoing, and will remain ongoing for several years.

## STANDING

To have standing to bring this appeal, an organization like the Delaware Riverkeeper Network must demonstrate three factors: (1) that one or more of its members have suffered or will suffer an "injury in fact"; (2) that this appeal is germane to the organization's purpose; and (3) that participation of individual members is not necessary for the appeal. *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 994 (9th Cir. 2000). "Injury in fact" is shown when a member suffers an injury to his or her interests that is both actual or

12

imminent and concrete and particularized, the injury is fairly traceable to the actions of the respondent/appellee, and the injury is likely to be redressed by a favorable ruling. *See Laidlaw*, 528 U.S. at 180- 81; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Each of these elements is satisfied here.

Petitioners have standing as a not-for-profit environmental protection organization whose executive director, who is also a member, uses and enjoys the specific geographic areas affected by construction and operation of the Project, and whose recreational and aesthetic interests will be harmed by the faulty and unlawful issuance of a Certificate by the Commission for the Proposed Project. *See* AD017-26 (Maya van Rossum Declaration at ¶¶ 8-15); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). The Commission's violation of the Clean Water Act and the National Environmental Policy Act make it substantially more likely that Petitioners will suffer the harms described in the supporting affidavit now and in the future, thus demonstrating causation. *See Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996). The Delaware Riverkeeper Network's stated purpose is to preserve and protect the Delaware River Basin Watershed; this purpose is directly germane to the appeal of the unlawful certification of the pipeline project by the Commission. AD017-26 (Maya van Rossum Declaration at ¶¶ 3-5).  Construction and operation of the Project has harmed and will continue to harm Petitioners' protected recreational and aesthetic

13

interests in the environment, in particular the degradation and loss of valuable wetlands and habitat, thus constituting injury in fact within the zone of interests of the Clean Water Act, Natural Gas Act, and National Environmental Policy Act. *See* AD017-26 (Maya van Rossum Declaration at ¶¶ 7-15); *Laidlaw*, 528 U.S. at 180-81; *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996); *Bentsen*, 94 F.3d at 667.

Additionally, because Petitioners' appeal concerns only the question of whether the Commission's orders are lawful, it is not necessary for any individual member of the Delaware Riverkeeper Network to participate in this proceeding in order to secure effective relief for all its injured members. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If . . . the association seeks a declaration, injunction, or some other form of prospective relief, it can be reasonably supposed that the remedy, if granted, will inure to the benefit of those members . . . actually injured").

The harms identified above, and in the Maya van Rossum Declaration, would be redressed by this Court rescinding the Commission's Orders, or remanding the decision to ensure that the Orders comply with the CWA and NEPA. *See Lujan*, 504 U.S. at 572 n.7 (1992) (discussing relaxed redressability requirement for parties invoking procedural rights); *City of Jersey City v. CONRAIL*, 668 F.3d 741, 745 (D.C. Cir. 2012) (injury from increased risk of

14

environmental harm redressable by remand requiring review where review could inform conditions imposed on underlying action); *see also Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 753 F.3d 1304 (D.C. Cir. 2014) (remanding to Commission for further environmental review as a result of Commission's failure to comply with the National Environmental Policy Act). Petitioners ultimately seek to vindicate environmental concerns, and therefore Petitioners have standing.

## STANDARD OF REVIEW

Review of the merits of Respondent's approval of Intervenor's application for the Project is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701 to 706; *see also Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (claims challenging federal agency action under the Clean Water Act are subject to judicial review under the APA). Under the APA, "a reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989); *see also Specter v. Garrett*, 971 F.2d 936, 944 (3rd Cir. 1992). While this standard is deferential, "[d]eference . . . does not mean blind obedience." *Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571, 580 (D.C. Cir. 1999). Where an agency "entirely failed to consider an important aspect of the

15

problem," or failed to consider factors required by law, the action must be set

aside. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29,

43 (1983).

The standard of review requires that the agency reviewed all the relevant

factors:

> The task of a court reviewing agency action under the APA's arbitrary
> and capricious standard is to determine whether the agency has
> examined the pertinent evidence, considered the relevant factors, and
> articulate[d] a satisfactory explanation for its action including a
> rational connection between the facts found and the choice made.

*Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 202 (1st Cir. 1999) (quoting

*Penobscot Air Servs., Ltd. v. Federal Aviation Admin.,* 164 F.3d 713, 719 (1st Cir.

1999) (internal quotations omitted). "The reviewing court must determine whether

the decision was based on a consideration of the relevant factors and whether the

agency made a clear error of judgment." *Airport Impact Relief,* 192 F.3d at 202

(citing *Oregon Nat. Resources Council, supra,* 490 U.S. at 378).

> While this is a highly deferential standard of review, it is not a rubber
> stamp. The reviewing court must undertake a 'thorough, probing, in-
> depth review' and a 'searching and careful' inquiry into the record.
> Only by carefully reviewing the record and satisfying itself that the
> agency has made a rational decision can the court ensure that agency
> decisions are founded on a reasoned evaluation of the relevant factors.

*Id*. at 378 (citations omitted). Where important aspects of the problem are left out

because standard procedures were short-circuited, the agency's resulting decision

is arbitrary and capricious. *Cotton Petroleum Corp.' v. Dep't of Interior*, 870 F.2d 1515, 1525-27 (10th Cir. 1989).

The failure of an agency to obtain accurate baseline condition information for a proposed project prior to its approval prevents the decision-maker from determining the environmental impact of the project, such action is evidence of an arbitrary and capricious decision. *See N. Plains Research Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067 (9th Cir. 2011) (finding that a government agency who failed to provide adequate  baseline data to assess project impacts to aquatic resources failed to consider an "important aspect of the problem," resulting in an arbitrary and capricious decision) (internal quotations omitted); *see also Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) ("Without establishing the baseline conditions . . . there is simply no way to determine what effect the [action] will have on the environment. . .").

The Commission's interpretation of the Clean Water Act is not entitled to the judicial deference because the Environmental Protection Agency – not the Commission – is charged with administering the statute. *See* 33 U.S.C. § 1251(d) ("Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency ... shall administer this chapter"); *Cal. Trout, Inc. v. FERC*, 313 F.3d 1131, 1133–34 (9th Cir. 2002) (Commission's interpretation of CWA not entitled to deference); *see*

17

*also City of Olmsted Falls v. FAA*, 292 F.3d 261, 270 (D.C. Cir. 2002) ("[W]hen we are faced with an agency's interpretation of a statute *not* committed to its administration, we give no deference") (emphasis in original). Therefore the Court's review of the Commission's interpretation of section 401(a)(1) is *de novo*. *See Cal. Trout*, 313 F.3d at 1133–34 (Commission's interpretation of section 401(a)(1) reviewed *de novo*); *see also Chevron v. Natural Res. Defense Council*, 467 U.S. 837, 843 n. 9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent"); *Ass'n of Civilian Technicians v. FLRA*, 269 F.3d 1112, 1115–16 (D.C. Cir. 2001) (FLRA's interpretation of Travel Expenses Act—statute it does not administer—reviewed *de novo*).

## SUMMARY OF THE ARGUMENT

This appeal is about the Commission acting in direct contravention to the plain language of the Clean Water Act, and also violating fundamental aspects of National Environmental Policy Act. The Clean Water Act clearly demands that federal approvals – such as the certificates for public convenience and necessity that are issued by the Commission – can only be issued **after** the appropriate state, or states, have certified a project's compliance with their water quality standards. Here, the Commission issued its approval of the Project prior to Pennsylvania's issuance of its Clean Water Act Section 401 water quality certificate. Under the

Clean Water Act and this Circuit's precedents, the Commission had no authority to issue the Certificate in such a circumstance. As such, the Commission's action violated the Clean Water Act.

Additionally, the Commission violated NEPA by failing to establish an accurate baseline from which to conduct its environmental review of the Project. Specifically, the Commission grossly misidentified numerous specially protected wetlands, and miscalculated both the cover type categorization of those wetlands and the total acreage of those wetlands. The Commission's failure to begin its environmental review process with accurate environmental resource information renders its Environmental Assessment, and the Orders that rely upon it, arbitrary, capricious, or otherwise not in accordance with the law.

The Commission also violated NEPA by failing to disclose critical information related to gas flow velocity for the proposed Project, and by failing to respond to comments and an expert report identifying significant safety and operational problems with the Project. Additionally, the Commission violated NEPA by approving the proposed Project despite the admitted existence of gas flow velocities that far exceed gas flow velocities that the Commission specifically cited as a reason for denying a project alternative for a similar pipeline project.

## ARGUMENT

**I.    The Commission Violated 33 USC § 1341 because it Granted Intervenor's Request to Construct and Operate its Proposed Pipeline**

**Project Prior to the Issuance of a Section 401 Water Quality Certification**

The Commission violated the Clean Water Act by issuing its Certificate of Public Convenience and Necessity for the Project prior to the Pennsylvania Department of Environmental Protection issuing a Section 401 water quality certification. The Clean Water Act specifically requires state certification of compliance with state water quality standards as a condition precedent to any federal license or permit activity. Section 401 of the Clean Water Act, 33 USC § 1341(a)(1), states in pertinent part:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title . . . **No license or permit shall be granted until the certification required by this section has been granted or waived** . . .

33 USC § 1341(a)(1) (emphasis added). The meaning of this provision is that,

> States are required by Section 401 of the Act to provide a water quality certification before a federal license or permit can be issued for **any activity that may result in a discharge into intrastate navigable waters**.

*PUD No. 1 of Jefferson County v. Wash. Dept. of Ecology,* 511 U.S. 700, 707 (1994) (emphasis added). This explicit statement regarding the sequencing of the

20

water quality certification necessarily affects the ability of a federal agency like the Commission to issue certificates of public convenience and necessity.

As this Court found in *City of Tacoma v. FERC*, "[the Commission's] role is limited to awaiting, and then deferring to, the final state decision . . . [the Commission] . . . has an obligation to determine that the specific certification 'required by [section 401] has been obtained,' **and without that certification, [the Commission] lacks authority to issue a license.**" *City of Tacoma*, 460 F.3d 53, 68 (D.C. Cir. 2006) (emphasis added); *see also Ala. Rivers Alliance v. Fed. Energy Regulatory Comm'n*, 325 F.3d 290, 300 (D.C. Cir. 2003) ("[W]e conclude that section 401(a)(1) of the CWA requires Alabama Power to obtain water quality certification from the state of Alabama **before** [FERC] can issue a license") (emphasis added); *State of N.C. v. Fed. Energy Regulatory Comm'n*, 112 F.3d 1175, 185 (D.C. Cir. 1997) (Section 401(a)(1) "clearly provides that a Federal license or permit may not be granted" until the certification required by the Clean Water act has been "obtained or has been waived"); *Keating vs. Fed. Energy Regulatory Comm'n*,  927 F.2d 616, 619 (D.C. Cir. 1991) ("Without [a Section 401] state certification, neither the FERC license nor the Corps permit may be issued"); *United States v. Marathon Dev. Corp.*, 867 F.2d 96, 100 (1st Cir. 1989) ("If a state determines that discharges from a certain category of activity will

21

not meet state water quality requirements, the federal government is prohibited from authorizing the activity by federal permit").

Additionally, the Congressional history of Section 401(a)(1) also supports this plain reading of the statute. The predecessor of Section 401(a) of the Clean Water Act was Section 21(b) of the Water and Environmental Quality Improvement Act of 1970. When Congress enacted section 21(b), it described the provision as follows:

> No Federal license or permit shall be granted unless this [state] certification **has first been obtained** or there has been a waiver of this requirement as provided by this subsection. Denial of certification by a State . . . results in a complete prohibition against the issuance of the Federal license or permit.

H.R. Conf. Rep. No. 940, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin. News 2712, 2741 (emphasis added).

Here, the record is clear that a Section 401 water quality certification was required for the Project from the state of Pennsylvania. R. 406 at 28, JA ___. The record is also clear that the at the time the Commission issued the Certificate of Public Convenience and Necessity, the Pennsylvania Department of Environmental Protection had not yet issued the Section 401 water quality certificate for the Project. *See* R. 484, JA ___. Therefore, the Commission violated the plain meaning of the Clean Water Act, rendering its decision to certificate the Project arbitrary, capricious, or otherwise not in accordance with law. R. 445, R. 411 at 50-52.

22

While the Commission has the power to place conditions on its certificates under Section 7 of the Natural Gas Act, that power simply does not include the ability to re-write federal statutes. Section 401 of the Clean Water Act very clearly requires a water quality certificate to be issued by the state **before** any other federal approval. The Commission's issuance of the Certificate of Public Convenience and Necessity for the Project with the requirement to obtain the Section 401 water quality certificate at some later date gets Section 401 backwards. Nothing in the Commission's authority under the Natural Gas Act allows the Commission to blatantly ignore plain language of the Clean Water Act.

Indeed, the Natural Gas Act does not make any exceptions for licenses or permits that are conditioned on the subsequent grant of the 401 water quality certification. Congress could have created an exception in the Natural Gas Act of 1938, which was amended as recently as 2005, but did not do so. In the decades since the Clean Water Act was passed, Congress has repeatedly chosen not to reduce or modify the power of states under Section 401 of the Clean Water Act.

Congress could also have created a specific exception for pipelines, or other linear infrastructure projects, when it enacted the Clean Water Act, or in any one of the subsequent amendments, but did not. *See Thompson v. Calderon*, 151 F.3d 918, 929 (9th Cir. 1998) (finding that it "is elementary that a more recent and specific

statute is reconciled with a more general, older one by treating the more specific as an exception which controls in the circumstances to which it applies").

While the Commission has authority to impose conditions in its certificates, that power does not extend to overriding an explicit Congressional mandate. When Congress speaks directly to the issue at hand, "[t]he court…must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. 837, 842-43. In the case of whether a federal agency like the Commission can issue a federal license or permit before a state has issued its Section 401 water quality certification, Congress' intent was clear: "[n]o license or permit shall be granted **until** the certification required by this section **has been obtained or has been waived**." 33 U.S.C. § 1341(a)(1) (emphasis added). The plain language of the statute speaks for itself.

The Natural Gas Act grants the Commission an ability to attach "reasonable terms and conditions as the public convenience and necessity may require." *See* 15 U.S.C. § 717f(e). While we do not dispute the fact that the Commission may have the ability to issue certificates with some conditions, it cannot do so until **after** the state has issued or waived the Section 401 water quality certification. Otherwise the Commission consistently risks approving or restricting certain alternatives and other activities that violate a state's water quality standards.

24

Even if Petitioners are required to demonstrate that the Commission authorized specific activities that resulted in a discharge that triggered the requirement of a Section 401 water quality certificate – which they are not – the Commission still violated the Clean Water Act because the Commission authorized tree felling activities in wetlands, thus constituting a "discharge" triggering the standards and requirements articulated in Section 401(a)(1).

It is undeniable that tree felling in wetlands and other activities took place along substantial portions of the Project area during the four months between when the Commission issued its December 18, 2014 Order, and when the Department finally issued the Section 401 water quality certification on April 8, 2015.

Specifically, the Commission authorized Intervenor to begin the following activities: "construction at the Mt. Effort pipe yard," "tree felling activities . . . . in the Dorrance and Franklin Loops in Monroe and Luzerne Counties," "tree felling activities" for "Compressor Stations 515 and 520 in Luzerne and Lycoming Counties," "tree felling activities" for "certain upland segments of the Skillman and Pleasant Run Loops in Mercer, Somerset, and Hunterdon Counties," "construction at Compressor Station 205 in New Jersey and Compressor Stations 515 and 520 in Pennsylvania," and "tree felling of 7.63 acres of extra workspace along the Franklin Loop in Luzerne County." *See* R. 420, 422, 466, 474, JA ___-___, ___-___,___-___,___-___.

As a result of these various authorizations, Intervenor cut trees along 73,000 feet of right-of-way for the Franklin Loop, and 28,000 feet of right-of-way along the Dorrance Loop, including trees located in wetlands. R. 478 at 7, JA ___ (Bi-weekly status report showing that "100%" of "[t]ree clearing" was completed on Franklin and Dorrance Loops by March 22, 2015). The tree felling activities included permanently converting over eight and half acres of pristine forested wetlands into non-forested emergent wetlands, forever degrading the functions and values that those wetlands are capable of providing. R. 406 at 64, JA ___.

The case law is clear, the felling of trees and other vegetation in wetlands for the Project constituted a "discharge" triggering the requirement of a Section 401 water quality certification. In *Avoyelles Sportsmen's League, Inc. v. Marsh*, the Fifth Circuit Court of Appeals found that the clearing of vegetation in wetlands would "significantly alter the character of the wetlands and limit the vital ecological functions served by the tract," and therefore, when vegetation or other materials are "redeposited" in the wetland, the discharge language of Section 401 is triggered. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923-24 (5th Cir. 1983); *see also United States v. Deaton*, 209 F.3d 331, 336 (4th Cir. 2000) (holding that returning "seemingly benign substances like rock, sand, cellar dirt, and biological materials" to a wetland constituted a "discharge" pursuant to the Clean Water Act.); *Borden Ranch P'ship v. U.S. Army Corps of Engineers*, 261

26

F.3d 810, 814-15 (9th Cir. 2001) (holding that the removal of a "protective layer of soil" in a wetland triggered the "discharge" language of the Clean Water Act). Here, the record evidence clearly shows that **all** tree felling activities – including tree felling in and around wetlands – were finished in Pennsylvania before the Department issued the Section 401 water quality certification. R. 485, JA ___. As such, the Commission violated the Clean Water Act by authorizing activities that constitute a discharge requiring a Section 401 water quality certification.

Importantly, tree felling activities are **precisely** the type of activities that Pennsylvania's Section 401 water quality certification is designed to govern. Indeed, Petitioners repeatedly warned the Commission that tree felling activities should not proceed absent a Section 401 water quality certification from Pennsylvania because it is a violation of Pennsylvania's water quality standards to fell trees in certain types of specially protected wetlands. However, these comments were summarily ignored by the Commission. R. 445, JA ___-___.

In Pennsylvania, the water quality standards that must be observed in order for the state to issue a Section 401 water quality certification are defined and described in the Pennsylvania Code. *See* 25 Pa. Code §§ 93.4a-93.4d; 25 Pa. Code § 105.1; 25 Pa. Code § 105.15; 25 Pa. Code § 105.17; 25 Pa. Code § 105.18a; 25 Pa. Code § 105.20a; 25 Pa. Code § 105.451. These standards expressly apply to wetlands, and dictate that the Pennsylvania Department of Environmental

Protection is prohibited from issuing Section 401 water quality certifications for proposed projects that will have an "adverse impact" on the wetlands classified as "exceptional" pursuant to the Pennsylvania Code. *See* 25 Pa. Code § 105.18a(a)(1). Tree felling activities in wetlands resulting in the permanent conversion of forested wetlands to non-forested emergent wetlands therefore strikes at the core of Pennsylvania's water quality standards, as it adversely affects both the functions and values of those wetlands. R. 445, JA ___-___.

Petitioners submitted expert reports to the Commission putting the Commission on notice that the conversion of forested wetlands to non-forested emergent wetlands results in significant decreases to "above ground biomass," "structural diversity of the wetland," "local climate amelioration," "forest interior habitat," "visual and aural screening from human activity," "suitability of shade-loving plant species," and the "production of mast for wildlife." R. 411 at Ex. G, JA ___-___. Tree felling in wetlands also results in losses related to structural diversity, species diversity, and the loss of rare/ancient trees. *Id*. The wetland functions of "pollution prevention" and "sediment control" can also be expected to decrease. *Id*. Furthermore, wetland functions relating to drainage patterns, water quantity, and water quality are also adversely impacted by tree felling in wetlands. *Id*. The wetlands will also provide decreased "soil stabilization," "streambank

28

anchoring against erosion," "nutrient storage," "temperature maintenance," and storm damage shielding. *Id*.

Considering the Commission's blatant violation of the Clean Water Act by authorizing tree felling activities in wetlands, and Pennsylvania's clear regulatory commitment to prohibit precisely the type of activity that was authorized, the Commission's actions fundamentally neutered the state of Pennsylvania's well-established regulatory authority and "power to block the project." *See City of Tacoma*, 460 F.3d at 67.

The plain language of the Clean Water Act clearly contemplated the potential sequencing of events whereby a federal agency authorizes a project and thereby obstructs state's ability to modify or alter project plans pursuant to its rights under the Clean Water Act, which is exactly why the Clean Water Act requires the Section 401 water quality certification to be issued **prior** to any other federal licenses or permits. Here, by allowing tree felling activities to be conducted prior to the issuance of the Section 401 water quality certification materially restricted and inhibited Pennsylvania's ability to require alternative project design and resource mitigation or avoidance. In other words, by authorizing tree felling activities to begin prior to the issuance of the Section 401 water quality certification, the Commission infringed upon the right of Pennsylvania to review and place conditions on the Section 401 water quality certification that could

require the project applicant to significantly change scope and design of the Project. It is impossible to know what additional conditions Pennsylvania would have conferred upon the Section 401 water quality certification had the Commission not already committed to moving the Project forward absent the review and consent of the state.

This was exactly the concern raised by the New Jersey Department of Environmental Protection when Intervenor requested to begin tree felling activities in wetlands prior New Jersey issuing its Section 401 water quality certification. Specifically, the New Jersey Department of Environmental Protection submitted a letter to the Commission which stated:

> We respectfully request that FERC not issue a "Notice to Proceed" for any tree felling activities . . . until Transco has obtained all required approvals from NJDEP for the Leidy Southeast Expansion Project . . . We believe our request is extremely urgent since any tree felling activity prior to permit issuance may impact available alternatives for project design and mitigation.

R. 471, JA ___. A state's interest in protecting water quality through its Section 401 water quality certification process is well established, and has been explicitly enshrined by the Supreme Court:

> State certifications under § 401 are essential in the scheme to preserve state authority to address the broad range of pollution, as Senator Muskie explained on the floor when what is now § 401 was first proposed:
>
> > No [person] will be able to hide behind a Federal license or permit as an excuse for a violation of water quality

30

> standard[s]. No [person] will be able to make major investments in facilities under a federal license or permit without providing assurance that the facility will comply with water quality standards. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of water quality requirements.

*S.D. Warren Co. v. Me. Bd. of Envtl. Protection*, 547 U.S. 370, 386 (2006). The Commission's overreach here is therefore contrary to the plain meaning of Section 401(a)(1), as it undermined the foundation upon which Pennsylvania relies to protect its water quality.

Additionally, by allowing tree felling and other activities to begin in a situation where a state later denies the water quality certificate, the Commission runs the risk of authorizing construction activity to begin for a project that the state later stops by denying the Section 401 water quality certificate. This results in irreparable harm to the environment that would have been avoided if the Commission had simply complied with the Clean Water Act and waited to issue the approval, and/or any letter orders authorizing construction activity, until all the necessary federal approvals were acquired.

Unfortunately, this **exact** factual scenario recently took place with regard to the Constitution Pipeline Project. *See, e.g.,* 149 FERC ¶ 61,199 (2014). The Constitution Pipeline project is a Commission jurisdictional 124 mile natural gas pipeline project proposed to span parts of Pennsylvania and New York. *Id*. at PP1.

31

There the Commission issued its certificate for the project and authorized tree felling activities to begin in Pennsylvania before the New York Department of Environmental Conservation issued its Section 401 water quality certification for the project. Of the acres of trees that were authorized to be cut by the Commission in Pennsylvania were trees owned by a family that lost ninety percent of the trees they harvest in a commercial operation for maple syrup, thereby effectively destroying the family-run business. *See* https://stateimpact.npr.org/pennsylvania /2016/03/02/maple-syrup-trees-cut-to-make-way-for-the-constitution-pipeline/.

On April 20, 2016, the New York Department of Environmental Conservation denied the Section 401 water quality certification for the project pursuant to its powers to "block" the project. *See* AD033-46 (Joint Application: DEC Permit# 0-9999-00181/00024 Water Quality Certification/Notice of Denial, New York Department of Environmental Conservation, April 20, 2016). Therefore, as a result of the Commission's premature and unlawful authorization of tree felling in violation of the Clean Water Act, the family now had their entire business unnecessarily cut to pieces. Additional examples of needless tree felling litter the right of way for the Constitution pipeline in Pennsylvania, leaving a permanent scar across the northern tier of the state.

In an illuminating admission, the Commission recently conceded that it does not have the expertise to determine whether tree felling in wetlands violates a

32

state's Section 401 water quality certification requirements.  On March 25, 2016,

the Commission issued a letter to Tennessee Gas Pipeline Company ("Tennessee")

with regard to the Connecticut Expansion Project, which expressly stated that

"before [the Commission] can complete [its] review" Tennessee "must" provide

additional information to the Commission, including:

> . . . evidence that the Massachusetts Department of Environmental
> Protection and the Connecticut Department of Energy and
> Environmental Protection concur that Water Quality Certificates
> under Section 401 of the Clean Water Act are not required for non-
> mechanized tree felling for the proposed Project.

AD027-30 ("Request for Additional Information in Response to the Request for

Limited Notice to Proceed with Tree Felling," FERC Docket No. CP14-529,

Accession 20160325-3003). In other words, before the Commission allowed any

tree felling for the Connecticut Expansion project, the Commission required that

the project applicant provide proof that both Connecticut and Massachusetts agree

that tree felling will not violate either of their state specific water quality standards.

The Commission therefore admitted that it simply does not have the expertise, or

authority, to determine whether tree felling in wetlands is prohibited by, or

materially impacts, a state's water quality certification process.

Here, not only did the Commission approve tree felling construction activity

prior to the issuance of the Section 401 water quality certificate, the Commission

did not even bother to ask the Pennsylvania Department of Environmental

Protection if such activities would violate Pennsylvania's water quality standards, or require proof of the same. Clearly, the Commission has adopted two conflicting approaches for two identically situated projects without providing any reason or explanation. The Commission's irreconcilable position is therefore further evidence of the Commission's arbitrary actions.

The Commission's sole duty with regard to the Section 401 water quality certification was to respect the rights of the states and their mandate to carry out the goals of the Clean Water Act. Ultimately, the Commission must follow the law, but failed to do so in issuing the December 18, 2014 Order before Pennsylvania issued its Section 401 water quality certification for the Project. The Commission's failure to comply with Section 401 of the Clean Water Act means that the December 18, 2014 Order was issued in a manner contrary to the Clean Water Act. As such, that Order should be vacated or otherwise remanded for further review.

## II. The Commission's Mischaracterization Of Project Impacts Fails To Provide An Adequate Baseline From Which A NEPA Review Can Proceed

The Commission violated NEPA by failing to properly identify the type and extent that resources will be impacted by the construction and operation of the Project. Specifically, the Commission failed to accurately identify and classify wetlands in the Project area, and also failed to calculate and account for the type expected harms to those same wetlands. As a result, the Commission was unable to

accurately establish a foundational baseline from which it could begin its NEPA review process to provide an accurate assessment of the harms associated with construction and operational activity in the wetlands. The Commission's approach therefore subverts the full disclosure and environmental impact analysis goals of NEPA. Additionally, the Commission failed to provide a reasoned explanation as to why it did not substantively respond to Petitioners comments and expert reports regarding wetlands harms, thereby also violating the NEPA.

NEPA requires that the agency "adequately considered and disclosed the environmental impact of its actions. . ." *Baltimore Gas & Electric Co. v. Natural Res. Defense Council, Inc.,* 462 U.S. 87, 97-98 (1983); *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1998) (finding that the "goal of [NEPA] is to ensure that federal agencies infuse in project planning a thorough consideration of environmental values").

A baseline is a practical requirement in a NEPA environmental analysis employed to identify the environmental consequences of a proposed agency action. *See American Rivers, Inc. v. FERC*, 201 F.3d 1186, n. 15 (9th Cir. 1999). It has been recognized that "[w]ithout establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay*, 857 F.2d at 510; *see also N. Plains Res.* Council, 668 F.3d at 1085 ("without [baseline] data,

35

an agency cannot carefully consider information about significant environment impacts. Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision.") (internal quotation marks and brackets omitted); Council on Environmental Quality, Considering Cumulative Effects under the National Environmental Policy Act, at 41 (January 1997) ("The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process"); *see also* 40 C.F.R. § 1508.27(b)(3).

NEPA requires that the lead agency provide the data on which it bases its environmental analysis. *See Lands Council v. Mcnair*, 537 F.3d 981, 994 (9th Cir. 2008) (holding that an agency must support its conclusions with studies that the agency deems reliable) (overturned on other grounds). Such analyses must occur **before** the proposed action is approved, not afterward. *See LaFlamme v. FERC*, 852 F.2d 389, 400 (9th Cir. 1988) ("[T]he very purpose of NEPA's requirement that an [environmental review] be prepared for all actions that may significantly affect the environment is to obviate the need for speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action") (internal citation and quotation marks omitted). This is consistent with NEPA's twin aims of (1) ensuring that agencies carefully consider information about significant environmental impacts; and, (2) guaranteeing relevant

36

information is available to the public. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1998).

### a. The Commission Improperly Classified Numerous Wetlands Impacted By The Proposed Project

The Commission's Environmental Assessment includes a section dedicated to the analysis of wetlands harms and mitigation. *See* R. 406 at 61-68, JA___-___. This section provides an evaluation of the various types of wetlands in the Project area, and the expected impacts of construction and operational activity on those wetlands. *Id*. The data collected and analyzed by the Commission must be accurate to provide a useful baseline from which the Commission can generate its NEPA environmental review. However, the Commission verifiably misclassified numerous specially protected wetland resources that were to be impacted by the proposed Project.

The Commission admits that the methodology and information collected for its NEPA review regarding wetlands "enabled staff to disclose and evaluate potential impacts on wetlands and to serve as a starting point for the development of protective mitigation," which included a "consideration of the water resource classifications for the potentially affected surface and groundwater resources." R. 569 at P37, JA ___. Therefore, it is clear that the Commission relied on the classification information and other data it collected with regard to evaluating impacts to wetlands. However, overwhelming evidence exists on the record –

37

including two expert reports and numerous comment letters – that the Commission improperly categorized a significant number of wetlands, which therefore prevented the Commission from making an informed decision regarding whether the Project would have a significant impact on wetlands necessitating further environmental review.

The Commission's wetlands analysis repeatedly cites to, and relies upon, the accumulation of data and information contained in Appendix I of the Environmental Assessment. *See* R. 406 at 63, JA___. Appendix I includes a variety information including wetland crossing length, the proposed construction method, and wetland disturbance acreage. R. 406 at I-1-3, JA ___-___.

Importantly, Appendix I also includes a column titled, "State Wetland Classification," which provides the state classification for each wetland impacted by the Project. *Id*. This is **crucial information** in the context of the Commission's NEPA review because States such as Pennsylvania classify their wetlands in a hierarchy based on the differing functions and values that each of the wetlands provide. Some wetlands are simply more functionally valuable than others, and therefore harms to those wetlands must necessarily be given greater weight or consideration in a NEPA review. *See, e.g.,* 40 C.F.R. § 1508.27(b)(3).

For example, wetlands in Pennsylvania are either classified as "exceptional" or "other" wetlands. *See* 25 Pa. Code §§ 105.17(1)-(2). To be classified as

38

"exceptional," wetlands must meet strict criteria demonstrating that the wetland provides particularly important water quality, wildlife habitat, or other vital ecological services. *See* 25 Pa. Code § 96.3(b); 25 Pa. Code § 93.4a; 25 Pa. Code §§ 105.18a(a)-(1). Degraded wetlands that do not meet any of the criteria are considered "other" wetlands. The Commission's classification of wetlands is the only information in the record that details the **quality of the functions and values that each wetland provides**.

Accurate information regarding the classification of the wetlands is therefore critical to the Commission's understanding of the potential harms caused by the construction and operation of the Project, and ultimately whether they result in a significant impact necessitating further environmental review. *See* 40 C.F.R. § 1508.27(b)(3) ("Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.") For example, if a pipeline project in Pennsylvania proposed to impact forty wetlands that were non-forested "other" wetlands as categorized pursuant the Pennsylvania Code, the environmental impact would be significantly less in the context of a NEPA review than if those same forty wetlands were categorized as high-value forested "exceptional" wetlands that are habitat for endangered species. This is exactly why the Commission makes a point of analyzing this data in its NEPA reviews.

Here, the Commission identified that there were a total of seven "exceptional" wetlands in Pennsylvania that would be impacted by the Project. R. 406 at I-1-3 JA ___-___.  DRN notified the Commission in its comments that this determination was a significant undercounting of the number of "exceptional" value wetlands in the Project area, and that the Commission was therefore grossly underestimating the potential impact of the Project on wetlands. R. 381 at 2-11, R. 411 at __, JA ___-___,  JA ___-___. Indeed, the only record evidence that provides a site-specific review of the criteria for proper wetland classification was provided by Petitioners to the Commission in an expert report by a wetlands specialist. R. 381 at Exhibit G, JA ___-___.This site-specific review based on Intervenor's application materials determined that there were at least **nine additional** wetlands that qualified as "exceptional" that were misidentified by the Commission as "other," and therefore not accounted for in the Environmental Assessment. *Id.*, JA ___-___. There is no evidence in the record that any certified wetlands specialist employed by the Commission performed a similar analysis.

Of the nine wetlands identified by Petitioners that were improperly classified as "other" wetlands, at least six of them qualified as "exceptional" because they lie within a floodplain of an "exceptional value" water, these wetlands include: WW-007-002, WW-001-038, WW-001-039, WW-001-040, WW-001-041, and WW-009-002. R. 381 at 7, JA ____. The record shows that three additional wetlands

40

qualify as "exceptional" wetlands as a result of being suitable bog turtle habitat, these include wetlands: WW-001-0169, WW-001-019, and WW-001-021. R. 381 at 7, JA ___. An on-site review of these wetlands by a certified wetlands specialist, confirmed by photographic evidence, clearly documented that each of the aforementioned wetlands were incorrectly characterized by the Commission. R. 381 at 8, JA ___.

Importantly, Petitioners' expert evaluation was later **expressly verified by Intervenor**. Indeed, Petitioners' analysis actually proved to be a very conservative estimate of the total number of "exceptional" wetlands in the project area. After the Commission issued its Certificate, Intervenor admitted to the Pennsylvania Department of Environmental Protection that the wetlands categorizations they initially provided to the Commission were largely inaccurate. Intervenor conceded that all nine of the wetlands Petitioners identified were indeed "exceptional" wetlands, and added that an additional fifteen wetlands should also be evaluated as meeting the strict criteria for being "exceptional" wetlands. *See* AD031-32 (Wetlands Table, Chapter 105 Application). Instead of **seven** "exceptional" value wetlands existing in the project area – as accounted for in the Environmental Assessment generated by the Commission – there were actually **thirty-one**. *Id*.

The Commission's miscalculation therefore represents an undercounting of roughly 340 percent. Such a drastic and widespread failure to account for the

41

impacts to critical and specially protected wetlands is likely due to the fact that the Commission never field-verified any of the wetlands data that it relied upon in the Environmental Assessment, **despite being presented uncontroverted evidence by a qualified wetlands specialist that the analysis the Commission was relying on was fatally flawed**. R. 381 at 2-11, JA ___-___. Furthermore, the Commission never collected, analyzed, or reviewed any evidence relating to the criteria by which Pennsylvania determines the quality and therefore classification of its wetlands. R. 381 at 3-6, JA ___-___. Indeed, nothing of the sort appears in the record. By arbitrarily ignoring the condition and ecological importance of the impacted wetlands, the Commission failed to account for the significance of their loss in the Environmental Assessment and Finding of No Significant Impact.

This is also an excellent example of why it is so important for the Commission to follow letter of the law of the Clean Water Act, and wait to issue its Certificate of Public Convenience and Necessity until after the State has issued its Section 401 water quality certification. Otherwise the Commission risks issuing NEPA documents and other orders based on incomplete or verifiably inaccurate information, which is exactly what happened in the instant matter. This is precisely the type of flawed and incomplete analysis that NEPA and the Clean Water Act is designed to prevent, yet the Commission repeatedly allows this flawed type of analysis and improper sequencing of review to occur.

42

The Commission simply could not have made an informed decision regarding a baseline from which to measure the wetlands impacts of the proposed Project if the Commission failed to first properly classify the wetlands that were to be impacted in the first place. There is no doubt that this is what happened in the instant matter. The wetlands at issue here received a special classification by the state of Pennsylvania because of the higher value and ecological importance of the wetland resources. And it is these high value resources that were not properly accounted for in the Environmental Assessment. The Commission's cavalier review renders the Environmental Assessment, and the Orders that necessarily rely upon the Environmental Assessment, legally and factually deficient. As such, the Commission's Orders are arbitrary, capricious, or otherwise not in accordance with law.

### b. The Commission Miscalculated the Impact to Wetland Cover Type from the Proposed Project

The Commission also failed to accurately account for the expected ground disturbance impacts that will result from the Project's construction and operational activity. In addition to failing to properly classify wetlands, the Commission also miscalculated the impacted acreage and cover type for many of the wetlands in the Project area. These critical mistakes provide further evidence of a failure by the Commission to determine a proper baseline for its Environmental Assessment, thus rendering its decision to certificate the Project unlawful.

The Environmental Assessment's wetlands analysis section provides description of the cover type for each of the wetlands that will be impacted. R. 406 at 62, I-1-3, JA__-__, __-__. This analysis is important because the cover type of wetlands is a determinative factor regarding a wetland's functions and values. For example, a forested wetland supports increased natural biological functions, drainage patterns, water quantity, water quality, and pollution control functions as compared to non-forested emergent wetlands. R. 381 at G, JA ___-___.

A description of each of the different types of wetlands in the project area, their associated cover types, and some of the functions they provide appeared in the body of the Environmental Assessment section on wetlands. R. 406 at 62, JA ___. Appendix I specifically included a column for categorizing "Wetland Type," which is designed to identify the National Wetlands Inventory designation for each wetland, which included: "PEM" = Palustrine Emergent Wetland; "PSS" = Palustrine Scrub-Shrub Wetland; and "PFO" = Palustrine Forested Wetland. R. 406 at Exhibit I-1-3, JA ___-___.

An accurate analysis of cover type is essential in the NEPA review process here because the Commission found that the "primary impact of the Project on wetlands would be an alteration of wetland value due to vegetation clearing." R. 406 at 64, JA ___. More specifically, the Environmental Assessment states that:

> The conversion from one vegetation cover type to another could result in changes in wetland functions and values by altering the amount of

44

> sunlight or other environmental conditions in the wetland, affecting
> wildlife habitat.

R. 406 at 64-65, JA ___-___. Indeed, the harms to trees and vegetation in wetlands
were so significant that the Commission required a separate compensatory
mitigation program in the application for the Project. *Id.* at 67-68, JA ___-___. A
review of the record clearly shows that the Commission improperly categorized the
cover type for numerous wetlands, and therefore the baseline from which the
Commission made its determination of No Significant Impact was deficient.

Of the forty-nine wetlands in Pennsylvania identified by the Commission in
Appendix I of its wetlands analysis, the cover type of at least **fourteen wetlands**
were incorrectly identified by the Commission, R. 381 at 8-11, JA ___-___, an
error rate of nearly thirty percent. All fourteen of the wetlands whose cover type
was improperly identified were "exceptional" wetlands pursuant to the
Pennsylvania Code. *Id.* at 9, JA ___. Petitioners below cite to aerial photographs of
the resources to demonstrate the Commission's mischaracterization of wetland
resource cover type, and therefore how Commission undercounted and
misrepresented the amount of temporary and permanent impacts to these wetlands.

One of the many egregious examples of a mischaracterization of "Wetland
Type" is the Commission's classification of wetland WW-007-002. Wetland WW-
007-002 was identified by the Commission as a PEM wetland; however, a review
of the aerial photograph of this wetland **clearly** shows that wetland WW-007-002

is almost entirely forested in cover type, and therefore should be classified as a PFO. R. 183 at Resource Report 2, B-5 (page 15 of 43), JA ___-___.

The Commission misclassified wetland WW-001-038. Wetland WW-001-038 was identified by the Commission as a PEM wetland; however, a review of the aerial photograph of this wetland shows that wetland WW-001-038 has a combination of forested, shrub scrub, and emergent cover type that will be impacted by project construction and operation. Therefore, the wetland should be classified as a PFO/PSS/PEM. R. 183 at Resource Report 2, B-5 (pages 13-14 of 43), JA ___.

The Commission misclassified wetland WW-001-021. Wetland WW-001-021 was identified by the Commission as a PEM wetland; however, a review of the aerial photograph of this wetland shows that wetland WW-001-021 has a combination of forested, shrub scrub, and emergent cover type that will be impacted by project construction and operation. Therefore, the wetland should be classified as a PFO/PSS/PEM. R. 183 at Resource Report 2, B-5 (page 34 of 43), JA ___.

The Commission misclassified wetland WW-001-019. Wetland WW-001-019 was identified by the Commission as a PEM wetland; however, a review of the aerial photograph of this wetland shows that wetland WW-001-019 has a combination of forested, shrub scrub, open water, and emergent cover type that

46

will be impacted by project construction and operation. Therefore, the wetland should be classified as a PFO/PSS/PEM/POW. R. 183 at Resource Report 2, B-5 (page 37 of 43), JA ___.

The Commission misclassified wetland WW-001-039. Wetland WW-001-039 was identified by the Commission as a PEM wetland; however, a review of the aerial photograph of this wetland shows that wetland WW-001-039 has a combination of forested and emergent cover type that will be impacted by project construction and operation. Therefore, the wetland should be classified as a PFO/PEM. R. 183 at Resource Report 2, B-5 (page 13 of 43), JA ___.

The Commission misclassified wetland WW-001-041, which is an Exceptional Value Wetland. Wetland WW-001-041 was identified by the Commission as a PEM wetland; however, a review of the aerial photograph of this wetland shows that wetland WW-001-041 has a combination of forested, shrub scrub, and emergent cover type that will be impacted by project construction and operation. Therefore, the wetland should be classified as a PFO/PSS/PEM.  R. 183 at Resource Report 2, B-5 (page 10 of 43), JA ___.

The Commission misclassified wetland WW-009-001. Wetland WW-009-001 was identified by the Commission as a PEM wetland; however, a review of the aerial photograph of this wetland shows that wetland WW-009-001 has a combination of forested cover type and scrub shrub cover type that will be

47

impacted by project construction and operation. Therefore, the wetland should be classified as a PFO/PSS. R. 183 at Resource Report 2, B-5 (page 4 of 43), JA ___.

Petitioners specifically identified each one of these wetlands in their comments, and had a certified wetlands specialist field verify the cover types identified above. R. 381 at 8-11, JA ___-___. Inexplicably, the Commission failed to respond to this analysis in both the Environmental Assessment and the Order Denying Rehearing, as such, there is no evidence refuting any of these cover type classifications anywhere in the administrative record. The only glimmer of reasoning provided by the Commission justifying their improper categorizations is a brief statement that the "wetland delineations were conducted using the Corps' Wetlands Delineation Manual," and that this "methodology is sufficient." R. 406 at P77, JA ___. However, this singular answer is utterly non-responsive to the conclusions in Petitioners' expert report. The Commission failed to properly identify numerous wetlands impacts, and as a result, the Commission also failed to account for these impacts in its flawed NEPA analysis. As such, the Commission's Order and Finding of No Significant Impact is arbitrary, capricious, or otherwise not in accordance with law.

The Commission's blatant misidentification of wetland cover type violates NEPA's requirement to work from an accurate baseline to determine the environmental impact of the proposed Project. NEPA was designed to ensure that

48

important effects will "not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise case." *Robertson*, 490 U.S. at 349. Unfortunately for the high-value "exceptional" wetlands here, the die was cast the minute the Commission unlawfully approved the Project and authorized tree felling.

### III.   The Commission Violated NEPA by Failing to Disclose or Verify Flow Velocity and Other Technical Data Necessary to Determine the Full Extent of the Project's Inter-relatedness to Previous, Pending, and Future Projects, and also to Determine the Operational Safety of the Project

A pipeline engineering expert reviewed the gas flow velocity information in the Project application and determined that the safety and interconnectedness of the proposed Project with other Transco pipelines necessitated the disclosure of additional information that did not appear in the administrative record. R. 305, JA ___-___. This information is necessary to determine whether the Commission improperly segmented its review of multiple pipeline projects similar to the way in which they unlawfully reviewed the projects in *Delaware Riverkeeper Network et al. v. Federal Energy Regulatory Commission*. *Delaware Riverkeeper Network*, 753 F.3d at 1313-16.

Petitioners filed a data request for the necessary information regarding relating to gas flow velocities in March of 2014. *Id*. at 3-4, JA ___-___. Additional requests for this information were filed on April 2, 2014; April 10, 2014; April 17, 2014; and July 25, 2014. R. 309, R. 313, R. 316, R. 349, JA ___, JA ___, JA ___,

49

JA ___. Petitioners never received any of information that specifically addressed the requests made in Petitioners' letters from Intervenor or the Commission. The information requested by Petitioners therefore does not appear anywhere in the Environmental Assessment, its supporting documents, the Order, the Order Denying Rehearing, or anywhere else in the administrative record. The Commission's failure to disclose this critical information violates the fundamental precepts of NEPA that demand full disclosure of relevant information, and renders the Order and the Order Denying Rehearing arbitrary, capricious, or otherwise not in accordance with law.

NEPA procedures emphasize clarity and transparency of process over particular substantive outcomes. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004); *see also Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 n. 24 (9th Cir. 2010) ("Clarity is at a premium in NEPA because the statute . . . is a democratic decisionmaking tool"). Specifically, NEPA "guarantees" that relevant information "will be made available to the larger [public] audience." *Robertson*, 490 U.S. at 349. NEPA seeks to promote informed agency decision-making by "requiring full disclosure of the basis for agency action." *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1073 (1st Cir. 1980); *see also Inland Empire Pub. Lands v. United States Forest Serv.*, 88 F.3d 754, 758

(9th Cir. 1996) (finding that NEPA is concerned with the process of disclosure, not any particular result).

Accordingly, agencies violate NEPA when they fail to disclose that their analysis or the record contains incomplete information. *See N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009); *see also Motor Vehicles Mfrs.*, 463 U.S. at 43 (holding that an agency acts arbitrarily and capriciously when it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted). Such required "up-front disclosures [include] relevant shortcomings in the data or models." *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005); *see also* 40 C.F.R. § 1502.22 (An agency "shall make clear" if there is "incomplete or unavailable information" in an NEPA environmental review document).

The very purpose of public issuance of an Environmental Assessment pursuant to NEPA is to "provid[e] a springboard for public comment." *Public Citizen*, 541 U.S. at 768. It is well established that "where comments from responsible experts [provide] **conflicting data** or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored.  There must be good faith, reasoned analysis in response."  *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973) (emphasis added);

51

*see also Friends of the Earth, Inc. v. Hall*, 693 F. Supp. 904, 934 (W.D. Wash. 1988) (A NEPA review that fails to disclose and respond to "the opinions held by well respected scientists concerning the hazards of the proposed action is fatally deficient"); *Pacific Coast Federation of Fisherman's Ass'ns v. U.S. Dept. of the Interior*, 929 F.Supp.2d 1039, 1056 (E.D. Ca. 2013) ("The underlying environmental data relied upon to support the expert conclusions must be made available to the public").

For natural gas transmission pipelines, such as the Project, actual gas velocities are a "critical variable" that drive pipeline design decisions. R. 381 at Exhibit D at 2, JA ___. For example gas velocities that exceed the design specifications of a given pipeline can result in internal particulate erosion that threatens the integrity of the pipeline. *Id*. at Exhibit D at 4, JA ___. The Commission is well aware of the issue of gas velocity erosional limit ranges, because the Commission recently rejected a possible pipeline alternative in an application where the Commission found that "transporting the current and proposed gas volumes through only the existing pipeline would result in gas velocity significantly above TGP's recommended maximum design velocity of approximately 40 feet per second. This increased velocity could compromise the pipeline's integrity and safety." R. 381 at 20, JA ___. Indeed, gas flow velocity was recently questioned as a possible culprit for the explosion of a Texas Eastern

natural gas transmission line in May of 2016. *See* http://powersource.post-gazette.com/powersource/companies/2016/05/11/Could-faster-gas-flow-have-contributed-to-Texas-Eastern-pipeline-erosion/stories/201605110092.

Additionally, accurate gas velocity measurements are necessary to determine the functional independence or dependence of a proposed pipeline project in relation to other pipeline projects. If a pipeline project functionally relies on past or future pipeline projects to operate, those projects must be accounted for in a NEPA review document. *See Delaware Riverkeeper Network*, 753 F.3d at 1304.

On March 25, 2014, Petitioners submitted a comment letter to the Commission stating that an initial review of the application material by a pipeline engineering expert "revealed that the operation of Transco's proposed Project will result in unsafe gas velocities at several locations along Transco's system that pose direct threats to the safety of the system; and as a result, would require additional future looping of Transco's system." R. 305 at 1-2, JA ___-___. The comment stated that in order to further confirm its analysis, additional information must be disclosed that is currently not part of the administrative record, and that without this information it would be impossible for Commission engineers, or the public, to accurately evaluate gas flow velocity impacts. *Id*. at 2, JA ___. The letter then identified nine specific questions that would provide the necessary information for this review, these questions included:

1. The pipe diameters and where they change,
2. The pipe grade and where the grade changes,
3. The pipe wall thicknesses,
4. The mileage for each pipe grade along the system,
5. Include the MAOP for each pipe segment and where it changes,
6. Identify for each pipeline segment the location of gas meters (if any) along the Transco system Loops that may be used to allocate gas flow between the various pipeline segments
7. Gas flow rates in MMSCF/D, for all stream inputs and deliveries along the systems,
8. Pressures at the respective inlet and delivery points along the system for the peak flow case, and
9. At each compressor station, include the compressor HP, fuel usage, compressor suction pressure, compressor discharge pressure, the compression ratio, gas volume compressed in MMSCF/D.

*Id*. at 3, JA ___. On April 2, 2014, April 10, 2014, and April 17, 2014, DRN submitted comment letters to the Commission stating that the Commission failed to provide responses to DRN's March 2014 data request. *See* R. 309, R. 313, R. 316, JA ___, JA ___, JA ___. Each of these subsequent comment letters renewed DRN's request for an answer to the nine questions provided in the March 2014 letter. *Id*.

The Commission submitted a letter to Intervenor on July 23, 2014 to verify that Intervenor provided DRN with the information it requested. R. 346, JA ___-___. Intervenor responded to the Commission on July 25, 2014 stating that it believed that the information contained in exhibits G and G-II combined with a quarter-page spreadsheet Intervenor provided to the Commission on July 14, 2014 sufficiently provided "the requested information." R. 348, JA ___-___.

54

On July 25, 2014 Petitioners submitted a comment letter replying to the July 2014 Intervenor letter. R. 349, JA ___-___. Petitioners' July letter made it clear that Petitioners already had access to, and indeed based its initial comments from the March 2014 letter on, the flow diagrams contained in Exhibits G and G-II, and that Intervenor's limited additional submission of data was non-responsive to any of the nine questions. *Id.* Transco never provided the requested for information, and therefore the information does not appear anywhere in the administrative record.

On September 10, 2014, Petitioners submitted an additional comment letter relating to the Environmental Assessment for the Project. R. 381, JA ___-___. Attached to that comment was a report generated by a pipeline engineering expert, which concluded it is likely that "[h]igh actual gas velocities suggest further expansion of the Transco system is required to bring these segments into compliance with Transco's own design parameters and industry safe operating practices." *Id.* at Exhibit D at 1, JA ___. Importantly, the report cautioned that the "supporting documents for the Transco Project provided under CEII Nondisclosure Agreements are very poor, lacking sufficient relevant details to reliably evaluate this system at important points where actual gas velocities may be critical." *Id.* at Exhibit D at 3, JA ___.The report further specified that the information in the record "lack[ed] basic critical information, such as [maximum allowable operating

pressures] of pipeline system, existing pipe parameters (such as grade, wall thickness and diameter), and system operating pressures along the Leidy Loop for the boundary cases." *Id*. at Exhibit D at 8, JA ___. Lastly, the report concluded that "[a] simple hydraulic profile, critical to determining if each project is justified on its own and thus not segmented, cannot be reliably developed from the limited CEII data provided." *Id*., JA ___.

This analysis, based on the flow velocity diagrams in the record, is the **only evaluation in the record of the gas flow velocity implications of the Project**. *See* R. 385, JA ___-___. Therefore, this expert report, the accompanying flow velocity analysis, and the questions and concerns it raised are wholly unanswered and unrebutted by both the Commission and Intervenor.

The Commission repeatedly failed to disclose information addressing both the safety and independent viability of the Project, which are issues that strike at the core of the Commissions NEPA analysis. The Commission could have easily remedied this problem by requiring Intervenor to answer the nine questions posed by Petitioners and submitting those answers to the Commission docket; however, by failing to provide or otherwise disclose the information requested the Commission violated NEPA. Considering Petitioners' analysis raised substantial questions about the Project, the Commission's decision to provide a Certificate of

Public Convenience and Necessity for the project was arbitrary and capricious, or otherwise not in accordance with law.

## IV.    The Commission Violated NEPA by Unlawfully Treating Similarly Situated Parties Differently

As noted above, the Commission is well aware of gas velocity erosional safety issues, and also the resulting design and engineering limitations caused by those gas velocity issues. However, the Commission failed to provide an explanation as to why it treated two different pipeline project proposals differently despite the existence of identical factual circumstances. The Commission's differing treatment, without reason or explanation, renders the Commission's decision arbitrary, capricious, or otherwise not in accordance with law.

This Court has long held that federal agencies must provide adequate explanation before it treats similarly situated parties differently. *See, e.g., New Orleans Channel 20, Inc. v. FCC*, 830 F.2d 361, 366 (D.C. Cir. 1987); *Public Media Ctr. v. FCC*, 587 F.2d 1322, 1331 (D.C. Cir. 1978); *Melody Music, Inc. v. FCC*, 345 F.2d 730, 733 (D.C. Cir. 1965).

In November of 2011, the Commission issued an Environmental Assessment for the Northeast Upgrade Project. As part of that analysis the Commission concluded that a project proposal was not "hydraulically feasible" because the increased velocity above the company's recommended maximum design velocity

of 40 feet per second "could compromise the pipeline's integrity and safety." R. 381 at 20, JA ___.

The Commission requested Intervenor to "[f]ile the maximum   gas  velocity that would occur at the proposed facilities." R. 195 at 157, JA ___. Intervenor responded that the pipeline would have "a flow velocity ranging from 30 to 50 fps." *Id*. After Petitioners raised concerns about flow velocity, Intervenor walked back their statement, admitting that one segment would exceed sixty feet per second. R. 406 at 174, JA ____.

Despite the fact that critical information was missing from the administrative record with regard to flow velocity data, Petitioners' expert report was able to make a preliminary determination that "velocities are most likely exceeding 60 fps in the system[] . . . based on the limited information in Exhibit G and associated documents supplied to me under CEII for the Project." R. 381 Exhibit D at 3, JA ___. Petitioners' report found that this problem is likely widespread, stating that the Commission's "conclusions that their velocities for the Northern market only exceed 60 fps in one line, [are] not credible." R. 381 Exhibit D at 3, JA ___. The Commission can point to no hydraulic modeling or analysis in the administrative record showing that flow velocities are consistent with Intervenor's bare and unsupported statement. Indeed, the only analysis on the record is Petitioners expert

report calling into serious question the long-term safety and operational viability of the Project.

The Commission has failed to explain why it has chosen to allow Intervenor to operate at velocities higher than its stated design threshold, while it denied Tennessee Gas and Pipeline Company for exceeding its design threshold. Despite devoting eight paragraphs to the issue of gas velocities in the Order, R. 406 at PP25-31, JA ___-___, the Commission simply did not address the fact that for a previous pipeline project involving substantially similar facilities the Commission came to the conclusion that exceeding velocity limits was not safe; yet here, came to the opposite conclusion that exceeding velocity thresholds was safe. This irreconcilable position provides yet another example of a dispositive deficiency with regard to the Commission's decision to issue the Certificate of Public Convenience and Necessity for the Project.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Commission's Order, and Order Denying Rehearing, be rescinded or remanded, and any other relief the Court deems just and equitable.

Respectfully submitted this 3rd day of June, 2016,

*/s/ Aaron Stemplewicz*

Aaron Stemplewicz
Delaware Riverkeeper Network

59

925 Canal Street, Suite 3701
Bristol, PA 19107
Phone: 215.369.1188
Fax: 215.369.1181
aaron@delawareriverkeeper.org

Counsel for: *Petitioners Delaware Riverkeeper Network and the Delaware Riverkeeper*

## CERTIFICATE OF COMPLIANCE

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 13,537 words, excluding the parts of the brief exempted  by Fed. R. App. P. 32 (a)(7)(B)(iii).

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 Point Times New Roman.

Dated: June 3, 2016                    *s/ Aaron Stemplewicz*

                                                   Aaron Stemplewicz
                                                   Counsel for: *Petitioners Delaware Riverkeeper Network and the Delaware Riverkeeper*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that I have, this 3rd day of June, 2016, filed the foregoing with the Court via the Court's CM/ECF system and served the foregoing upon the counsel listed in the Service Preference Report via email through the Court's CM/ECF system.

Pamela S. Goodwin, Esq.                    EMAIL
Direct: 215-972-8407
Email: pgoodwin@saul.com
Saul Ewing
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

Patrick F. Nugent, Esq.                    EMAIL
Direct: 215-972-7134
Email: pnugent@saul.com
Fax: 215-972-4157
Saul Ewing
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

John F. Stoviak, Esq.                      EMAIL
Direct: 215-972-1095
Email: jstoviak@saul.com
Fax: 215-972-1921
Saul Ewing
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

Elizabeth U. Witmer, Esq.                  EMAIL
Direct: 610-251-5062

Email: ewitmer@saul.com
Fax: 610-408-4400
Saul Ewing
1200 Liberty Ridge Drive
Suite 200
Wayne, PA 19087

Karin Larson                                    EMAIL
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20406
Phone: 202-502-8236
Fax: 202-273-0901

Robert Solomon                                  EMAIL
Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20406
Phone: 202-502-8236
Fax: 202-273-0901

Dated: June 3, 2016                    _s/ Aaron Stemplewicz_

                                        Aaron Stemplewicz
                                        Counsel for: *Petitioners Delaware
                                        Riverkeeper Network and the
                                        Delaware Riverkeeper*