Docket Number: 16-1092
ORAL ARGUMENT NOT YET SCHEDULED
_____

UNITED STATES COURT OF APPEALS

DISTRICT OF COLUMBIA
_____

Delaware Riverkeeper Network, et al., *Petitioners*,

v.

Federal Energy Regulatory Commission, *Respondent*, and

Transcontinental Gas Pipe Line Company, L.L.C., *Intervenor*.
_____

REPLY BRIEF OF DELAWARE RIVERKEEPER NETWORK, AND THE

DELAWARE RIVERKEEPER, MAYA VAN ROSSUM

_____

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, Pennsylvania 19007
215-369-1188 (tel)
aaron@delawareriverkeeper.org

Counsel for: *Petitioners*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY........................................................................................iv

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ........................................................................................2

    I.     Petitioners Need not Directly Challenge the Letter Orders to Prevail on Their Claim that the Commission Violated the Clean Water Act .........................................................................2

    II.    The Commission Violated the Clean Water Act Even Absent a Consideration of Tree Felling in Wetlands ...........................................12

    III.   The Commission's Failure to Appropriately Classify and Evaluate Wetland Quality Violates the National Environmental Policy Act ........................................................16

    IV.   The Commission's Failure to Appropriately Identify Wetland Cover Type Resulted in a Significant Miscalculation of Wetland Mitigation Compensation in Violation of NEPA ...............................................................20

    V.    The Commission Violated NEPA by Ignoring the Only Analysis of Gas Flow Velocity in the Administrative Record And Relying on Unsupported Statements by the Commission and the Project Applicant ...................................22

CONCLUSION....................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AES Sparrows Point LNG v. Wilson*, 589 F.3d 721 (4th Cir. 2009).......................16

*Alabama Rivers Alliance v. Federal Energy Regulatory Commission*, 325 F.3d 290

    (D.C. Cir. 2003)..........................................................................6

*\*City of Grapevine v. U.S. Dep't of Transportation*,

    17 F.3d 1502 (D.C. Cir. 1994) ..................................................... 13-14

*Concerned Citizens of Chappaqua v. U.S. Dep't of Transportation*, 579 F.Supp.2d

    427 (S.D.N.Y. 2008)..........................................................................12

*Del. Riverkeeper Network, et al v. Pennsylvania Department of Environmental*

    *Protection, et al.*, 3d Cir. No. 15-2122, slip op ..................................8,9

*Envtl. Def. Fund v. Blum*, 458 F. Supp. 650 (D.D.C. 1978)................................. 4-5

*\*Envtl. Def. Fund v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) ...................................24

*Gifford Pinchot Task Force v. United States Fish and Wildlife Service*, 378 F.3d

    1059 (9th Cir. 2002) ..........................................................................18

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ......................10

*\*Gunpowder Riverkeeper v. Federal Energy Regulatory Commission*, 807 F.3d

    267 (D.C. Cir. 2015)..........................................................................11

*Islander East Pipeline Co., LLC v. Connecticut Dep't Envtl. Prot.*, 482 F.3d 79 (2d

    Cir. 2006)..........................................................................16

*Murray Energy Corp. v. FERC*, 629 F.3d 231 (D.C. Cir. 2011) ..............................4

*Nat'l Comm. for the New River, Inc. v. FERC*, 433 F.3d 830 (D.C. Cir. 2005)........4

*New York v. Shinnecock Indian Nation*, 523 F.Supp.2d 185 (E.D.N.Y. 2007) ......12

*Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) .......................10

*\*Oregon Natural Desert Association v. Jewell*, 823 F.3d 1258 (9th Cir. 2016) .....19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).......................19

*Sierra Club v. U.S. Dep't. of Agriculture*,

   777 F. Supp. 2d 44 (D. D.C. 2011)................................................................ 11-12

*Tennessee Gas Pipeline Co. v. Delaware Riverkeeper Network*, 921 F.Supp.2d 381

   (M.D. Pa. 2013) .........................................................................................16

*Walter O. Boswell Memorial Hospital v. Heckler*,

   749 F.2d 788 (D.C. Cir. 1984)..............................................................................4

**Statutes**

 33 U.S.C. § 1341(a) ........................................................................................ 8-9

33 U.S.C. § 1344(a)-(d) ......................................................................................8

33 U.S.C. § 1362(6) .............................................................................................6

15 U.S.C. § 717r....................................................................................................16

**Regulations**

36 C.F.R. § 800.1(c)...........................................................................................14

# **GLOSSARY**

| | |
|---|---|
| Certificate Order | Certificate of Public Necessity and Convenience |
| Commission | Respondent - Federal Energy Regulatory Commission |
| Ind | Index |
| JA | Joint Appendix |
| NEPA | National Environmental Policy Act |
| Transco | Intervenor - Transcontinental Gas Pipe Line Company |
| DRN | Delaware Riverkeeper Network, and the Delaware Riverkeeper |
| R | Administrative Record as per Amended Certified Index |

## SUMMARY OF ARGUMENT

The Federal Energy Regulatory Commission's ("Commission") Certificate of Public Convenience and Necessity ("Certificate Order") for Transcontinental Gas Pipe Line Company's ("Transco") Leidy Southeast Expansion Project ("Project") violated both the Natural Gas Act and the Clean Water Act. The Commission and Transco's responses are notable for their complete failure to contest crucial factual and legal points Petitioners ("DRN") raised.

For example, with regard to DRN's claim that the Certificate Order violated the Clean Water Act because it was issued prior to the Section 401 water quality certificate, *see* Pet. Br. 19-34, both the Commission and Transco ("Respondents") do not contest that tree felling in wetlands took place. Respondents further do not contest the tree felling in wetlands occurred prior to the Section 401 water quality certificate. Respondents also fail to explain how, under the Commission's current practices, harms can be avoided in situations where the Commission issues its Certificate and allows construction activities to take place on the ground for a project that is later blocked by a state pursuant to the Clean Water Act (as occurred with the Constitution Pipeline).

With regard to DRN's claim that the Commission failed to take a "hard look" at wetlands, *see* Pet. Br. at 35-50, Respondents do not contest that the only data in the administrative record evaluating the **quality** of wetlands was plainly

1

inaccurate, resulting in the Commission failing to account for the quality of over half the wetlands impacted in Pennsylvania. Respondents fail to substantively contest the inaccurate classification of wetland cover types for numerous wetlands. Respondents then fail to explain how it could calculate appropriate wetland mitigation replacement ratios when the baseline information was verifiably flawed.

Lastly, with regard to the lack of data provided to determine the safety and interconnectedness of the Project, *see* Pet. Br. at 50-57, the Commission states that it relied on a specific gas flow modeling analysis, but fail to cite to where the analysis appears in the administrative record. They cannot do so because it does not exist in the record, or in any exhibit or addendum Respondents provided to this Court.

## **ARGUMENT**

### I.     DRN Need not Directly Challenge the Letter Orders to Prevail on Their Claim that the Commission Violated the Clean Water Act

The entire opening section of the Commission's Response attempts to conflate the evidence in the administrative record that shows a violation of the Clean Water Act (the letter orders) and the agency action which DRN challenges (the Certificate of Public Convenience and Necessity). *See* Resp. Br. at 18-22.[1] The Commission inaccurately characterizes that DRN's Clean Water Act claims rely upon challenging the letter orders the Commission issued; however, DRN's claims

---

[1] Transco similarly parrots this same argument. *See* Int. Br. at 12-13.

squarely focus on how the Certificate of Public Convenience and Necessity is the agency action that violated Section 401(a)(1) of the Clean Water Act. *See* Pet. Br. at 20-34. The letter orders are merely cited as record evidence memorializing the fact that the activities that took place on the ground prior to the Certificate Order which were "discharges" that triggered Section 401(a)(1). *See* Pet. Br. at 8-9.

The Commission primarily complains that because DRN did not seek rehearing on any of the letter orders, "those individual decisions are not properly before this Court." Resp. Br. at 19. However, such an argument fails for a number of reasons. First, and most obviously, DRN need not challenge the individual letter orders in order to prevail. The agency action challenged here is the Commission's decision to issue a Certificate of Public Convenience and Necessity prior to the Section 401 water quality certification in violation of the Clean Water Act. *See* Pet. Br. at 2. While the Commission's individual letter orders allowing tree felling activities in wetlands may be separately actionable violations of the Clean Water Act, the letter orders are important **here** because they provide specific factual descriptive detail regarding what kinds of actions took place in the wetlands, and when those actions occurred. *See* Pet. Br. at 8-9 (quoting from the letter orders descriptions of how tree felling activities took place in the wetlands prior to the Section 401 water quality certificate being issued). As such, the Commission fails to apprehend DRN's argument.

The Commission's citation to *Murray Energy Corp. v. FERC*, and the *National Committee for the New River* further shows that the Commission misses the point. *See* Resp. Br. at 19-20. In both of those cases the petitioners sought to specifically challenge separate staff orders of the Commission as arbitrary and capricious. *See Murray Energy Corp. v. FERC*, 629 F.3d 231 (D.C. Cir. 2011); *Nat'l Comm. for the New River, Inc. v. FERC*, 433 F.3d 830 (D.C. Cir. 2005). Unlike the petitioners in those cases, DRN here references the letter orders primarily as evidence of the way in which the sequencing of the Certificate Order and the Section 401 water quality certificate violated the Clean Water Act . *See* Pet. Br. at 8-9. Indeed, nothing in those cases suggests that DRN is required to challenge the letter orders themselves in order to challenge a Commission's Certificate Order. In fact, none of the allegations brought in either of the two cases even involve alleged violations of the Clean Water Act. As such, the Commission's reliance on those cases is unfounded.

Additionally, the letter orders are undeniably part of the administrative record, *see* R.420, 422, 445, 466; JA000600-01, JA000602-03, JA000640-43, JA000644-46, and therefore may be reviewed and relied upon by this Court. *See Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Envtl. Def. Fund v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978) ("The agency may not skew the record in its favor by excluding pertinent but

unfavorable information"). Even if the letter orders are "not properly before this Court," other documents in the administrative record nevertheless provide substantially the same evidence – that the trees were felled into wetlands prior to the Section 401 water quality certificate being issued. *See* Pet. Br. at 26 (citing Transco's Biweekly Status Report showing that **all tree felling in wetlands** took place at least several weeks prior to the Section 401 water quality certificate being issued).

The Commission next contends that a determination regarding whether the activities resulted in a "discharge" thereby triggering the requirements of Section 401 of the Clean Water Act "necessarily involve factual determinations about what constitutes a discharge," and that the administrative record is not sufficiently developed to make such a determination. Resp. Br. at 21. However, there are simply no contested issues of fact here that would benefit from further factual development or consideration. Neither the Commission nor Transco contest, in any way, that tree felling construction activity took place in the wetlands all across the construction spread in Pennsylvania.[2] It is further uncontested by both Defendants

---

[2] Transco infers that the Commission characterized tree felling as "pre-construction activities." Int. Br. at 4-5. While such an assertion has dubious relevance to DRN's claims, it is nevertheless directly contradicted by the Commission's own words. For example, under the section aptly titled "Construction Procedures" the Environmental Assessment describes how the process of tree felling activities falls within project "construction procedures." R. 406 at 98; JA000239. Furthermore, Table 2.4.1-1 of the Environmental Assessment summarizes the acres of each land

that these activities took place prior to the Section 401water quality certification being issued.

Such tree felling necessarily introduced tree trunks, dead branches, leaves, bark, and numerous other organic matter into the wetlands, thus constituting a "discharge." *See* Pet. Br. at 25; *see also Alabama Rivers Alliance v. Federal Energy Regulatory Commission*, 325 F.3d 290, 299 (D.C. Cir. 2003) (finding that the "word 'discharge' contemplates the addition . . . of a substance or substances" to a navigable water) (internal quotations and citations omitted); 33 U.S.C. § 1362(6) (the discharge of a pollutant includes "biological material"). Additionally, the wetlands will also be subject to an increased discharge of sediment laden water, and will discharge more sediment laden water to adjacent water bodies and uplands as a result of tree felling activities. *See* R. 381 at G, 19-20, 21, 22, 29-30; JA000456-57, JA000458, JA000459, JA000466-67. DRN's wetlands specialist described in an expert report how tree felling activities in wetlands impacts the drainage patterns, water quantity, water quality of the wetlands, thereby fundamentally altering the physical and biological functions and values of the wetlands. *Id*. at 29-30; JA000458. For example, tree felling results in additional

---

use type that would be affected by "construction" and "operation" of the loops. *Id*. Under the column "Forest Land" Table 2.4.1-1 indicates that over 105 acres will be impacted by "construction" activities. *Id*. As such, it is clear that both the Project applicant and Commission contemplated tree felling activities as "construction" activities.

discharges of water to the wetland and from the wetland as a result of losses to "aboveground biomass" thereby increasing "erosion and sedimentation" to the wetland, and decreasing "pollution prevention," "soil stabilization," "streambank anchoring against erosion," "nutrient storage," and "temperature maintenance" wetland functions. *Id.* The Commission never mentions, let alone addresses, the issues and concerns in the Certificate Order or Rehearing Denial.

The Commission's sole argument that tree felling did not result in a "discharge" is limited to the assertion that DRN is "wrong." Resp. Br. at 21. And for support, the Commission relies entirely on a string cite identifying a letter from the Army Corps of Engineers ("Corps"), and a recent opinion of the Third Circuit Court of Appeals.[3] *Id.* However, these citations provide no support for the Commission's position. The Corps was not, in any way, responsible for determining what constituted a "discharge" under Section 401 of the Clean Water Act for this Project. Indeed, the Corps administered the Section 404 dredge and fill permit for the Project, not the Section 401 water quality certification. *See* Resp. Br. at 7 (admitting that Pennsylvania and New Jersey are "responsible for evaluating applications" under Section 401 of the Clean Water Act). This is important because the standard that triggers the Corps' review under Section 404 of the Clean Water Act is fundamentally different than what triggers a Section 401 water quality

---

[3] Transco covers these same exact arguments in slightly more detail, but they are similarly unavailing. *See* Int. Br. at 12-15.

7

certification. Indeed, the Corps' Section 404 review process is initiated where there is a "discharge of **dredged or fill materials**," whereas the states' Section 401 review process is triggered via "**any discharge** into navigable waters." *Compare* 33 U.S.C. § 1344(a)-(d) (emphasis added), *with* 33 U.S.C. § 1341(a) (emphasis added).[4]  As such, the Corps' letter is entirely irrelevant here, because: 1) the Corps did not administer the Section 401 water quality certificate; and 2) the Corps' standard under the Clean Water Act is nevertheless different than the standard triggering Section 401(a)(1).

The Third Circuit's opinion in *Delaware Riverkeeper Network v. Pennsylvania Department of Environmental Protection* is equally inapposite. In that case, the question of whether tree felling in wetlands constituted a "discharge" pursuant to Section 401(a)(1) of the Clean Water Act was never briefed, argued, or addressed. *See Del. Riverkeeper Network, et al v. Pennsylvania Department of Environmental Protection, et al.*, 3d Cir. No. 15-2122, slip op.  Indeed, the reason why the Court denied the petition was precisely because the tree felling happened **prior** to when the Pennsylvania had the opportunity to issue the Section 401 water

---

[4] Transco mistakenly contends that the "Clean Water Act states that any applicant for a federal Section 404 permit to construct or operate a facility **that may result in a discharge to navigable waters** needs to obtain 'a certification from the State in which the discharge originates.'" (emphasis original). However, Transco confuses the standard between the Section 401 water quality certificate, and a Section 404 dredge and fill permit. As such, Transco's entire argument from pages thirteen through fifteen can be ignored.

quality certification. *See Del. Riverkeeper Network*, 3d Cir. No. 15-2122, slip op. at

47 ("FERC authorized tree clearing several weeks before PADEP issued the Water

Quality Certification. Therefore, the Water Quality Certification could not have led

to tree clearing because such clearing was approved without a Certification" by a

different agency). This distinction is crucial. The Court here faces an entirely

different question, which asks whether the Certificate Order was unlawfully issued

prior to the Section 401 water quality certificate. The tree felling is only important

to the extent the Court seeks evidence that activity took place on the ground prior

to the Section 401 water quality certificate being issued that "may" have caused a

discharge. 33 U.S.C. § 1341(a)(1).[5]

   The Commission further complains that the issue of what constitutes a

"discharge" pursuant to Section 401(a)(1) was not properly preserved. Resp. Br. at

21. However, this argument is flatly contradicted by the record.  DRN clearly

identified to the Commission in its comments and rehearing request that it was

unlawful for the Commission to issue a Certificate of Public Convenience and

Necessity absent the Section 401 water quality certification. *See* R. 411 at 50-51;

JA000593-94. DRN need only provide the agency a "fair opportunity to entertain

the issue in the administrative forum." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d

1251, 1290 (D.C. Cir. 2004). DRN need not state their claims in precise legal

---

[5] As discussed in Section II, and Pet. Br. 19-24, this evidence is not even necessary
for Petitioners to prevail.

terms, and need only raise an issue "with sufficient clarity to allow the decision maker to understand and rule on the issue raised." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 968 (9th Cir. 2006) (internal quotation omitted). Here, DRN clearly raised the issue of the improper sequencing of the Commission's approval of the Project that is now before the Court. *See* R. 411 at 50-52; JA000593-95.

Even if DRN needed to raise in precise legal terms the way in which the Commission violated Section 401 (a)(1), DRN did so by stating that the Commission was prohibited from allowing certain activities to proceed such as "earthmoving and tree clearing" absent the Section 401 water quality certification. R. 411 at 51; JA000594. DRN also claimed that the Commission "routinely authorizes construction activity to begin once the Certificate has been issued, even where all the necessary federal permits – such as a 401 Water Quality Certification – have not been obtained." *Id*. Furthermore, as discussed above, DRN dedicated an entire expert report to the issue of how tree felling activities in wetlands specifically harms wetlands, and results in increased discharges to and from the wetlands. *See* R. 381 at Exhibit G, 29-30; JA000466-67. As such, the Commission had more than a fair opportunity to consider the issue.

The Commission contends in a footnote that because the Section 401 water quality certification was already issued, the DRN's claims are likely moot and

10

therefore non-justiciable. *See* Resp. Br. at 22 n. 3. However, according to the Commission's logic, the Commission can authorize activities that violate a state's water quality standards, wait until a now hamstrung state issues a Section 401 water quality certificate addressing the remaining issues, and then hide behind the mootness doctrine. Furthermore, this Court already considered and rejected the Commission's argument in *Gunpowder Riverkeeper v. Federal Energy Regulatory Commission*. *See Gunpowder Riverkeeper*, 807 F.3d 267, 272 (D.C. Cir. 2015) (finding that the Commission's "argument fails because it disregards [petitioner's] challenge under the NEPA, which is unaffected by issuance of the state certification required by the CWA). A case is only moot if "events have so transpired that the decision [of the court] will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Daimler Trucks N. Am. LLC v. EPA*, 745 F.3d 1212, 1216 (D.C. Cir. 2013). Here, by vacating or remanding the Certificate Order, the Court would provide an opportunity for the Pennsylvania Department of Environmental Protection ("Department") to appropriately address and mitigate wetlands tree felling, an opportunity it was robbed from considering when the Commission allowed tree felling prior to the Department evaluating the issue. *See also Sierra Club v. U.S. Dep't. of Agriculture*, 777 F. Supp. 2d 44, 52-53 (D. D.C. 2011)

(providing the "availability of retroactive relief when the federal agency has failed to provide that process in accordance" with an environmental statute).

Lastly, Transco curiously argues that unlawful tree felling does not constitute "irreparable harm" to Petitioners' interests. Int. Br. at 19-21. As Transco is well aware, the preliminary injunction standard is not the standard here. In any case, Transco's averment is wrong. *See Concerned Citizens of Chappaqua v. U.S. Dep't of Transportation*, 579 F.Supp.2d 427, 433 (S.D.N.Y. 2008) ("felling of trees has been held to constitute an irreparable environmental injury sufficient to warrant a preliminary injunction"); *see also New York v. Shinnecock Indian Nation*, 523 F.Supp.2d 185, 301 (E.D.N.Y. 2007) (finding irreparable harm where "anticipated construction . . . will have a detrimental environmental impact, some of which is essentially irreversible, such as the destruction of trees").

## II. The Commission Violated the Clean Water Act Even Absent a Consideration of Tree Felling in Wetlands

The conditional authorization of the Project in the Certificate Order violates the express and unambiguous language of the Clean Water Act even without a consideration of any activity on the ground. *See* Pet. Br. at 19-24. To combat this assertion, the Commission and Transco heavily rely on Judge Rogers' concurring opinion in *Gunpowder Riverkeeper*, which suggests that absent some type activity on the ground the Commission's practice of issuing conditional certificate orders is not a violation of the Clean Water Act. *See Gunpowder Riverkeeper*, 807 F.3d at

12

275, 279-81 (Rogers, J., dissenting in part and concurring in the judgment). However, such an argument is fatally flawed and unsupported by existing case law.

The Commission and Judge Rogers primarily cite to *City of Grapevine v. U.S. Dept. of Transportation*, to support the theory that the Commission's conditional certificate orders are not a violation of the Clean Water Act. *See* Resp. Br. at 29-30. However, a careful review of this case demonstrates that it lends no support to the Commission's position. In *City of Grapevine*, the petitioners argued that the Federal Aviation Administration unlawfully conditionally approved a proposed runway project before completion of the review process required by the National Historic Preservation Act. The pertinent part of the National Historic Preservation Act requires that:

> the head of any Federal agency . . . shall, **prior to the approval of the expenditure of any Federal funds** on the undertaking . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.

*City of Grapevine*, 17 F.3d 1502, 1508 (D.C. Cir. 1994) (emphasis added). The Court found that the conditional approval was appropriate because by "issuing its Decision the FAA did not 'approv[e] the expenditure of any Federal funds' for the runway." *City of Grapevine*, 17 F.3d at 1509.

Here, the Clean Water Act expressly requires that "[n]o license or permit shall be granted until the certification required by this section has been granted or

13

waived." 33 USC § 1341(a)(1). The distinction in what is forbidden by the statutes is critically important because the Federal Aviation Administration's issuance of a conditional approval of the project did not allow what the National Historic Preservation Act expressly forbade. In other words, the Clean Water Act specifically forbids the issuance of the Commission's Certificate until "the [water quality certification] required by this section has been granted or waived" – **which did occur**. Whereas the National Historic Preservation Act more narrowly only forbids the "expenditure of funds" prior to the approval – **which did not occur**. As such, equating these two cases is inappropriate. Furthermore, the National Historic Preservation Act's implementing procedures specifically allow conditional approvals for nondestructive planning activities. 36 C.F.R. § 800.1(c). The Clean Water Act includes no such provision. Unlike the Federal Aviation Administration in *City of Grapevine*, the Commission approved what the Clean Water Act strictly forbids by issuing its conditional Certificate Order prior to the project applicant obtaining the Section 401 water quality certification.

The reason why this distinction is so important is further illustrated by the multitude of harms that resulted from the Commission's conditional order approving the Constitution Pipeline project. *See* Pet. Br. at 31-32. There, the Commission issued its conditional order and allowed tree felling and other activities to begin in a situation where a state later denied the water quality

certificate. *Id*. The Commission contends that the only risk of the Commission's approach is limited to the "certificate holder" who "commits its own resources" to a project that may ultimately be rejected. Resp. Br. at 29. However, such a callous framing of the "risk" engendered by the Commission's conditional approvals utterly ignores the harms to the landowners who had their land taken and trees cleared, or those who previously enjoyed unspoiled waterways and wetlands in public parks, or those people whose very livelihoods were forever altered as a result of tree felling for a Project that was never built. *See* Pet. Br. at 32 (identifying a family's maple syrup business that was destroyed by the tree clearing for the Constitution pipeline). Neither the Commission nor Transco has an answer for how to avoid such situations under the Commission's current practices.

Lastly, Transco's improper collateral attack on the Certificate Order should be rejected. *See* Int. Br. at 15-19. Transco contends that the Certificate Order is not a "license or permit" and therefore Section 401(a)(1) is not triggered by the issuance of the Certificate Order. *Id*. However, here the Commission recognized that its Certificate Order would trigger Section 401(a)(1), and specifically required Transco to obtain Section 401 water quality certifications. R. 359, JA000171. If Transco desired to challenge the Certificate Order's requirement that Transco obtain Section 401 water quality certificates, Transco needed to submit comments to the agency, preserve the issue in a rehearing request, and initiate litigation

15

pursuant to Section 717r of the Natural Gas Act. *See* 15 U.S.C. § 717r. However, Transco failed to do so and posits this claim for the first time in this Court; as such, Transco's radical attempt to strip states of their ability to protect their water quality standards through Section 401(a)(1) must be rejected. Furthermore, Transco fails to alert the Court to the cases that have involved challenges to Section 401 water quality certificates issued by states pursuant to a Commission jurisdictional pipeline project. *See, e.g., Tennessee Gas Pipeline Co. v. Delaware Riverkeeper Network*, 921 F.Supp.2d 381 (M.D. Pa. 2013); *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721 (4th Cir. 2009); *Islander East Pipeline Co., LLC v. Connecticut Dep't Envtl. Prot.*, 482 F.3d 79 (2d Cir. 2006).

## III.   The Commission's Failure to Appropriately Classify and Evaluate Wetland Quality Violates the National Environmental Policy Act

The only data collected and analyzed by the Commission regarding wetland quality were verifiably inaccurate, and therefore failed to provide a sufficient baseline from which the Commission could generate its NEPA environmental review. *See* Pet. Br. at 37-43. DRN agrees with the Commission's statement that agencies are entitled to select their own "methodology" as long as that methodology is "reasonable." Resp. Br. 36 (citation omitted). However, here, the Commission's methodology was demonstrably unreasonable.

The Commission first offers a strawman argument claiming that DRN contends that "the Commission erroneously classified wetlands in the Project area .

16

. . because the Commission **declined to use the States' wetland classification criteria**." Resp. Br. at 35 (emphasis added). The Commission then quizzically adds that it "simply used a different methodology than Riverkeeper preferred." Resp. Br. at 36.This is utter nonsense. Not only did DRN make no such claim, the record clearly shows that the Commission **expressly chose** to use "States' wetland classification criteria" to identify and evaluate the **quality** of the wetlands impacted by the Project. *See* Pet. Br. at 37-38; *see also* R. 406 at Exhibit I-1-3; JA000328-31. Indeed, the Commission included a specific column in Appendix I of the Environmental Assessment that was strictly dedicated to this exact classification methodology. *See* Pet. Br. at 38-39. This is true for both wetlands in New Jersey and Pennsylvania. Furthermore, for those wetlands in Pennsylvania, the Commission made crystal clear that its classification of wetland quality was expressly based on the methodology as "defined in Pennsylvania Administrative Code 25, Chapter 105.17." R. 406 at Exhibit I-1-3; JA000328-31.

Based on this methodology the Commission then identified seven of the fifty-one wetlands – or thirteen percent – were exceptional value wetlands meeting the highest and most strict criteria in Pennsylvania's hierarchy of wetland classification. *See* Pet. Br. at 40. This finding was proven false by DRN's expert report, which showed that there were at least sixteen wetlands that were exceptional value. *Id*. The Project applicant later corroborated DRN's expert report

after the Certificate Order had been issued, and expanded upon it by finding that no less than thirty-one wetlands were actually exceptional value. *Id*. Therefore, instead of thirteen percent of the wetlands impacted by the Project being classified as exceptional value – as examined and disclosed by the Commission in the Environmental Assessment – in reality, over sixty percent of the wetlands were exceptional value. Therefore, the Commission's environmental assessment failed to consider the exceptional quality of at least **half** the wetlands in the Project area.

The Commission would have this Court ignore this failure as a mere "flyspeck" unworthy of further consideration. Resp. Br. at 37.  However, errors are harmless "only when a mistake of the administrative body is one that **clearly had no bearing** on the procedure used or the substance of decision reached." *Gifford Pinchot Task Force v. United States Fish and Wildlife Service*, 378 F.3d 1059, 1071(9th Cir. 2002) (quotation omitted) (emphasis original). Here, the Commission admitted that the "primary impact of the Project on wetlands would be an alteration of wetland value." R. 406 at 64, JA000205. As such, the Commission's undisputed errors in identifying exceptional quality wetlands were more than harmless because the inaccurate information materially impeded informed decision making regarding the Project's mitigation measures, and also hindered the public's ability to meaningfully participate in the NEPA process. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (finding

18

that NEPA provides for public participation in assessing a proposed action's environmental consequences, enabling the public to "play a role in both the decisionmaking process and the implementation of that decision").

Without appropriate data regarding the quality of the functions and values of wetlands it was simply not possible for the Commission, or the public, to begin to assess whether the impacts would rise to the level of "significant" and necessitate further environmental review. Pet. Br. at 35-36; *see also* 40 C.F.R. § 1501.4 (if significant impacts are found the agency must prepare a more comprehensive Environmental Impact Statement). Furthermore, it was also not possible for the Commission to accurately calculate the appropriate size, scope, and ratio of wetland restoration that was proposed by the Commission for mitigation. The Commission simply cannot answer the question of how it can appropriately compensate for wetlands impacts if the Commission does not have an accurate starting point. *See Oregon Natural Desert Association v. Jewell*, 823 F.3d 1258, 1265 (9th Cir. 2016) (finding that the agency had a "duty to assess, in some reasonable way, the actual baseline conditions" and the agency's use of "inaccurate data" rendered its decision "arbitrary and capricious").

The Commission is reduced to arguing that it can be excused for its glaring oversight because it relied on the Army Corps of Engineers' manual for its wetlands determinations. *See* Resp. Br. at 35-36. While it is true that the

Commission can reasonably rely on the Army Corps of Engineers' manual for delineating the size and boundaries of the wetlands, that is simply not the issue DRN raises here. *See* Resp. Br. at 35. Rather, DRN's claim is that the record does not support the wetland classifications as contained in the Environmental Assessment, and that this failure to properly consider and disclose the **quality** of the impacted wetlands materially violated NEPA. *See* Pet. Br. at 37-43. Indeed, such a review of the quality of wetlands is entirely outside the scope the Army Corps of Engineer's review. Indeed, if the Commission solely relied on the Corps' wetlands manual it would simply have no way to differentiate a pipeline project that is proposed to impact forty degraded low value wetlands, versus a project that impacts forty high-value biologically intact "exceptional" wetlands. *See* Pet. Br. at 39.

## IV.    The Commission's Failure to Appropriately Identify Wetland Cover Type Resulted in a Significant Miscalculation of Wetland Mitigation Compensation in Violation of NEPA

The Commission also miscalculated the impacted acreage and cover type for many of the wetlands in the Project area, which made it impossible for the Commission to develop an accurate baseline to calculate compensatory mitigation. The Commission leaves unrebutted each of DRN's seven examples of the way in which the Commission failed to accurately identify the cover type of specific wetlands. *See* Pet. Br. at 45-48.

It does not take a certified wetlands specialist to look at the aerial photographs of wetland WW-007-002, and see that this wetland is almost entirely covered by trees. *See* R. 183 at Resource Report 2, B-5 (page 15 of 43); JA000134. One need only to cross-check this photograph with the Commission's description of the wetland to determine the absurdity of the Commission's calculations. *See* graphic below. According to the Commission's Environmental Assessment wetland WW-007-002 is a palustrine emergent wetland (which by definition has no trees), and therefore results in **zero impacts on forested wetlands**. R. 406 at Exhibit I-1-3; JA000328-31. Such a characterization is clearly false.



| State / Facility / Milepost Range | Wetland ID | Wetland Type [a] | State Wetland Classification [b] | Crossing Length (feet) [c] | Construction Impacts (acres) [d] | Operation Impacts (acres) [e] | Proposed Crossing Method [f] |
|---|---|---|---|---|---|---|---|
| *APPENDIX I* | | | | | | | |
| **Wetlands Affected by the Leidy Southeast Expansion Project** | | | | | | | |
| Pleasant Run Loop Subtotal | | | | 1,322 | 2.2 | <0.1 | |
| New Jersey Subtotal | | | | 3,788 | 5.7 | 0.2 | |
| **Pennsylvania** | | | | | | | |
| **Franklin Loop** | | | | | | | |
| 57.5 [b] | WW-007-007 | PEM | Other | NA | <0.1 | 0.0 | Open Cut |
| 58.4 | WW-001-012 | PEM | Other | 42 | <0.1 | 0.0 | Open Cut |
| 58.5 | WW-001-013 | PFO | Other | 63 | 0.1 | <0.1 | Open Cut |
| 58.9 | WW-001-014 | PSS/PFO | Exceptional | 274 | 0.8 | 0.3 | Open Cut |
| 59.0 | WW-001-016 | PEM/PFO | Other | 98 | 0.4 | 0.1 | Open Cut |
| 59.2 | WW-001-019 | PEM | Other | 9 | 0.1 | 0.0 | Open Cut |
| 59.3 | WW-001-020 | PSS/PFO | Exceptional | 410 | 1.2 | 0.4 | Open Cut |
| 59.6 | WW-001-021 | PEM | Other | 33 | 0.2 | 0.0 | Open Cut |
| 59.8 | WW-001-028 | PSS/PFO | Exceptional | 2031 | 4.3 | 1.8 | Push/Pull |
| 60.5 | WW-001-030 | PEM/PFO | Other | 123 | 0.2 | <0.1 | Open Cut |
| 61.1 | WW-001-022 | PEM | Other | 222 | 0.2 | 0.0 | Open Cut |
| 61.3 | WW-001-024 | PEM | Other | 105 | 0.3 | 0.0 | Open Cut |
| 61.6 | WW-001-025 | PEM | Other | 243 | 0.5 | 0.0 | Open Cut |
| 62.1 | WW-001-026 | PEM | Other | 226 | 0.2 | 0.0 | Open Cut |
| 62.3 | WW-001-027 | PEM/PFO | Other | 105 | 0.4 | 0.0 | Open Cut |
| 62.8 | WW-001-031 | PEM | Other | 440 | 1.1 | 0.0 | Open Cut |
| 63.4 | WW-001-032 | PEM/PFO | Other | 39 | 0.2 | 0.0 | Open Cut |
| 63.7 | WW-001-035 | PEM | Other | 205 | 0.1 | 0.0 | Open Cut |
| 64.1 | WW-001-036 | PSS/PFO | Exceptional | 1996 | 3.2 | 1.1 | Push/Pull |
| 64.9 | WW-007-002 | PEM | Other | 175 | 0.2 | 0.0 | Open Cut |
| 65.3 | WW-006-003 | PEM | Other | 37 | <0.1 | 0.0 | Open Cut |
| 65.4 | WW-001-038 | PEM | Other | 64 | 0.1 | 0.0 | Open Cut |
| 65.5 | WW-001-039 | PEM | Other | 174 | 0.6 | 0.0 | Open Cut |
| 65.9 | WW-001-040 | PEM/PFO | Other | 258 | 0.7 | <0.1 | Open Cut |
| 66.8 | WW-001-041 | PEM | Other | 135 | 0.4 | 0.0 | Open Cut |
| 67.0 | WW-007-009 | PEM | Other | 122 | 0.1 | 0.0 | Open Cut |
| 67.1 | WW-001-043 | PEM | Other | 384 | 0.3 | 0.0 | Open Cut |
| 67.1 | WW-009-002 | PFO | Other | 677 | 0.6 | 0.1 | Open Cut |

Neither the Commission nor Intervenor contests that the Environmental Assessment is riddled with these types of obvious errors, and both specifically fail to contest the seven examples provided in DRN's brief, including the one above

21

here. *See* Pet. Br. at 43-49. Furthermore, these mistakes are material because the Commission specifically chose to calculate its compensatory wetland mitigation based on wetland cover type. Indeed, the Offsite Mitigation Plan specifies that "[p]ermanent conversion impacts will be offset at a 3:1 ratio for [forested] wetlands and at a 2:1 ratio for [emergent] wetlands." R. 411 at 39; JA000412. These ratios simply cannot be calculated absent accurate baseline data regarding the cover type – forested, scrub/shrub, emergent – of the wetlands.

The Commission contends that it "can appropriately consider Transco's compliance with the Army Corps and state environmental certification requirements as a 'reasonable component' of its independent review." Resp. Br. at 39. However, the Commission never updated the Offsite Mitigation Plan to account for the plethora of exceptional quality wetlands that the Commission missed in its NEPA review, nor was the plan updated to reflect the inaccurate wetland cover type data as identified by DRN's expert reports. Such a negligent failure by the Commission undermines the fundamental precept of NEPA which requires accurate information to in order to facilitate informed public comment and good government decision making.

**V.  The Commission Violated NEPA by Ignoring the Only Analysis of Gas Flow Velocity in the Administrative Record And Relying on Unsupported Statements by the Commission and the Project Applicant**

DRN contends that their expert's review of gas flow velocity information in the Project application determined that the safety and interconnectedness of the proposed Project with other Transco pipelines necessitated the disclosure of additional information that did not appear in the administrative record. Pet. Br. at 49; R. 305, JA000138-42.

The Commission contends that "1) Transco has properly designed its pipeline system; 2) the pipeline will operate safely; and 3) no future looping is required to reduce gas velocities." Resp. Br. at 40. To support those conclusions the Commission states that it "based its findings on its independent review of Transco's explanation and supporting documentation, including Transco's SynerGEE (sometimes called Synergi) Gas hydraulic flow model." Resp. Br. at 41. However, the "SynerGEE" gas hydraulic flow model appears **nowhere** in the administrative record. While the Commission suggests that it exists, the Commission conspicuously fails to cite where it appears in the record. *See* Resp. Br. at 42. The Commission also fails to include the data as an exhibit or in the appendix to its Response, and does not explain to this Court how it can be accessed. *Id*. Transco similarly fails to show in the record where such information exists.

The Commission and Transco's failure to provide this information to the Court is crucial because the Commission is prohibited from relying on information

23

to support its decision that does not appear in the record. *See Envtl. Def. Fund v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) ("It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made").

Additionally, the Commission's statements that "under steady state conditions, flow velocities would not exceed 60 feet per second" and "[u]nder peak transient conditions, only one section would reach 61 feet per second," Resp. Br. at 40, are similarly unsupported conclusory assertions made by Transco that are not supported by the administrative record. Such bald assertions should not and cannot be reasonably relied upon by the agency in its decision making, particularly here where the only technical modeling that appears on the record was submitted as part of DRN's expert report. *See* R. 381 at Exhibit D; JA000424-33.

The Commission points out that "Transco offered to share its SynerGEE gas hydraulic flow models at Transco's office or via video conference," Resp. Br. at 42. First, this information does not appear in the record so it is irrelevant whether or not Transco made any such offer. Additionally, the Commission fails to explain to the Court that DRN rejected this offer because the applicant specifically refused to include the data in the administrative record. DRN reasonably made the decision that they would not waste their limited time and resources to fly their

24

expert from Washington to Texas and back again to review information that could

never be viewed, verified, or contested in the record.

Absent the SynerGEE gas flow modeling, the Commission is left solely

relying on a pipeline study that does not even examine natural gas pipelines. *See*

Resp. Br. at 41. As explained in DRN's pipeline engineering expert report, "this . .

. study is for **production flow lines**, not gas transmission pipelines," and therefore

the "gas velocities referenced in the above cited production flowline study,

especially the 100 fps limit are not appropriate for gas transmission pipelines." R.

381 at Exhibit D, 5; JA000428 (emphasis added). The expert report further

explains that:

> Gas transmission pipelines are by their very nature larger diameter,
> thinner walled, higher inventory, longer life pipelines, often moving
> massive volumes of gas . . . Flowlines tend to be much shorter, lower
> inventory . . . that do not move anywhere near the volume of gas on a
> daily business as transmission pipelines. It should be obvious that gas
> transmission pipelines, by their nature, warrant substantially different
> design/operational/maintenance approaches than production flow lines
> . . . Transmission pipelines can be exposed to liquids, such as liquids
> introduced from Marcellus scale "wetter" production . . . Droplet
> erosion is not usually the erosion risk of concern for gas transmission
> pipelines. The most likely threat to gas transmission pipelines related
> to erosion velocity is associated with particulates released down long
> pipelines.

*Id*. at 5-6; JA000428-29. The Commission failed to substantively respond to this

criticism anywhere in the record or in the Response. Because the Commission

unreasonably relied on a gas flow analysis that does not exist in the record, and a

study that does not even involve natural gas pipelines, the decision to issue the Certificate Order is arbitrary and capricious.

## **CONCLUSION**

For the foregoing reasons, DRN urge this Court to set aside, vacate, or remand the Commission's Certificate Order.

Respectfully submitted this 9th day of September 2016,

*/s/ Aaron Stemplewicz*
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
215-369-1188 (tel)

Counsel for: *Petitioners*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Circuit Rule 32(a)(7)(B) because this brief contains 6,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the type face and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced, 14-point typeface (Times New Roman) and is set in a plain, roman style, using italics for emphasis and citation only.


Dated: September 9th, 2016        */s/ Aaron Stemplewicz*
                                  Delaware Riverkeeper Network
                                  925 Canal Street, Suite 3701
                                  Bristol, PA 19007
                                  215-369-1188 (tel)

                                  Counsel for: *Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system on September 9th, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 9th, 2016        */s/ Aaron Stemplewicz*
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
215-369-1188 (tel)

Counsel for: *Petitioners*